**RADIATION TECHNOLOGY, INC.**
v.
The **UNITED STATES.**
No. 41–64.

United States Court of Claims.
Oct. 14, 1966.

Roger N. Boyd, Washington, D. C., for plaintiff; Eldon H. Crowell, Washington, D. C., attorney of record. Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

COLLINS, Judge.

The Department of Health, Education, and Welfare agreed, on February 2, 1962, to purchase from plaintiff eight scaler-timer-high voltage systems. In April 1962, the Government terminated the con-

tract for default. This action is based upon plaintiff's charge that the termination was wrongful. Defendant has filed a counterclaim for the difference between plaintiff's contract price and the cost of procuring the equipment from another manufacturer. Both plaintiff and defendant have moved for summary judgment.

The case was referred to Chief Commissioner Marion T. Bennett, who has submitted a report recommending that plaintiff's motion for summary judgment be denied and defendant's motion for dismissal of the petition and allowance of the counterclaim be granted. We accept the commissioner's conclusions as the appropriate outcome in this case.

The facts may be summarized as follows: The contract called for delivery of the eight instruments on April 3, 1962. Four were to be shipped to Rockville, Maryland, and the other four to Winchester, Massachusetts. The Public Health Service, which was the contracting agency, planned to use the systems, in conjunction with detectors, to measure the radioactive decay of nuclear particles in the atmosphere.

Plaintiff experienced management and production difficulties and, as a result, found it necessary to seek revision of the delivery schedule. Ultimately, the delivery date was extended to April 12th for Rockville and to April 13th for Winchester. The shipments by plaintiff were made in accord with the revised schedule. Upon arrival at the respective destinations, the instruments were inspected by Government personnel.

At Rockville, William J. Frezel, the author of the contract specifications, sought to ascertain whether plaintiff's products were in compliance with the requirements of the contract. At Winchester, Edmond Baratta tested the performance of the instruments. Each inspector found the systems which he examined to be defective in a number of respects. On April 19, 1962, the contracting officer, P. H. Shultz, advised plaintiff by telephone of the unsatisfactory nature of the instruments. On April 20th, Mr.

Shultz wrote Radiation Technology that, because of its failure "to deliver Scaler-Timer-High Voltage Systems in accordance with the specifications * * *," its right to proceed was terminated. The contracting officer added that plaintiff would be charged with the excess costs of reprocurement. The contracting officer ordered replacements from Picker X-Ray Corporation, and they were shipped within 5 days.

Mr. Shultz wrote Radiation Technology, on May 2d, that his actions had been necessitated by the urgency of the Government's need for the equipment.

Relying on the disputes clause of the contract, plaintiff appealed to the Secretary of Health, Education, and Welfare. A hearing was held before an *ad hoc* review board which, on August 15, 1963, recommended denial of the appeal. The board's decision was adopted by the representative of the Secretary. Subsequently, the present suit was commenced. Plaintiff seeks to recover $13,560, the contract price. The amount of defendant's counterclaim is $5,553.92.

The basic dispute between the parties relates to the propriety of terminating the contract without granting plaintiff an opportunity to repair the defective systems. This controversy pertains to the default clause which provided in part as follows:

(*a*) The Government may, * * * by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may

authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

Defendant asserts that summary termination under (*a*) (i) was proper contending that the term "delivery" in this subparagraph demands the delivery of conforming goods. This position, it alleges, is in accord with the definition of delivery set forth in both the Uniform Commercial Code and the Uniform Sales Act. Plaintiff concedes that under the authorities cited, delivery is equated with the tender of conforming goods, but argues that, under the contract in issue, the concept of delivery denotes a possessory concept, i. e., the physical transfer of possession. Arguing that use of the word "delivery" should be given a consistent interpretation, plaintiff points to the inspection provision of the contract, which anticipates acceptance or rejection after delivery.[1] It urges that the possibility of a rejection occurring after delivery would be rendered moot if delivery is to be equated with the shipment of conforming goods. Therefore, argues plaintiff, delivery relates only to a physical delivery and since, in this case, such delivery was timely (though on the last day), it is entitled to the 10-day extension available under subparagraph (*a*) (ii).

While there is obvious merit to both positions, it must be conceded that both are positions of the extreme. Adherence to plaintiff's view would preclude the Government's right to effect a summary termination so long as a timely shipment was made. A contractor could escape an automatic termination through the simple expedient of timely shipment, notwithstanding the distinct possibility that the shipment might be substantially defective. Frustration of delivery schedules becomes the obvious end product if this view is endorsed. By the same token, defendant's view would suggest similar undesirable consequences. Where delivery is measured against a doctrine of strict conformity, it invites the possibility of a surprise rejection occurring subsequent to a timely shipment. This, coupled with a summary termination power, would place in the hands of a contracting officer an unfettered right to reject and deny a contractor the opportunity to cure a nonconformity in his delivered product. Recourse to the courts becomes the inevitable consequence—a step made necessary because of the inflexibility inhering in defendant's view.

█ In our judgment, the accommodation of these conflicting positions can be best effected by defining the term delivery (as used in the default provisions) as the equivalent of a shipment which is in substantial compliance with contract specifications. In striking this balance, we necessarily reject the either/or basis upon which the parties have based their positions.

█ We read subparagraph (*a*) (i) as relating only to the issue of timeliness of delivery; it clearly does not define delivery itself. Subparagraph (*a*) (ii), on the other hand, speaks to circumstances other than those issuing out of delivery, i. e., events occurring *prior* to delivery which might suggest to the Government the possibility of the contractor's eventual default. Hence, a contractor cannot under this subparagraph claim an automatic extension when the possibility of his default is premised on the nonconformity of *delivered* goods.[2] Un-

---

1. The inspection provision of the contract included the following relevant section:
"(*c*) * * * Acceptance or rejection of the supplies shall be made as promptly as practicable after delivery, except as otherwise provided in this contract; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor."

2. This point addresses itself only to delivery occurring on the scheduled delivery date. Where delivery is in advance of this date, the contractor would be automatically entitled to the balance of the contract term in order to cure any deficiencies.

der the view which we espouse, the contractor is entitled to a reasonable period in which to cure a nonconformity provided that the supplies shipped are in substantial conformity with contract specifications.

In order to meet this requirement, it is incumbent at the outset that the contractor demonstrate that he had reasonable grounds to believe that his delivery would conform to contract requirements. Shipment alone is not an adequate badge of proof. Further, the right to cure assumes that the defects complained of are minor in nature and extent and are susceptible to correction within a reasonable time. Where extensive repair or readjustment is necessary in order to produce a fully operable product, substantial performance cannot be found and summary termination would be warranted. Other relevant considerations bearing upon the question of compliance involve the usability of the items, the nature of the product involved (whether it involves complex precision instruments as opposed to a routine production item), and the urgency of the Government's demand. The greater such urgency the greater the requirement that performance approach the overall level of strict conformity.

In concluding that the Government had an absolute right to terminate for nondelivery, Commissioner Bennett stressed the fact that, under the contract in issue, time had become "of the essence." While we are unable to accept his view in this regard, our differences are essentially academic and spell no departure in terms of ultimate result. And while we might question how time could become of the essence where extensions are granted *after* an initial delivery date has passed, we recognize, as did the commissioner, that the essential inquiry is whether the character of the rendered performance can be said to be in substantial compliance with contract demands. After a comprehensive review of the record, the commissioner upheld the board's findings that there had been no substantial compliance with the contract's specifications. This conclusion, coupled with his premise that *total* performance on the extended delivery date was essential, accounted for the commissioner's position.

It is our view that even where time is of the essence, i. e., where performance must occur by a given date, this factor does not demand that performance be measured in terms of strict conformity. It does require that performance be timely, but assuming this, there would thereafter remain for inquiry the question as to whether performance was substantial in other respects. However, since we accept the commissioner's basic conclusions regarding plaintiff's failure to render substantial compliance, based on the record, our disagreement with the commissioner in regard to his interpretation as to the meaning of "time being of the essence" (or even if time was, in fact, of the essence) becomes a moot point. Plaintiff could not prevail in either case.

█ The main issue that we have been requested to review concerned the application of the default provisions, noted supra. We have concluded that absent a shipment meeting the standard of substantial compliance, the fact that shipment was timely cannot operate to grant a contractor an automatic 10-day extension.

We also reject, for the reasons given by Chief Commissioner Bennett, the plaintiff's claim of lack of due process. No objection was raised by plaintiff at the time of the administrative proceedings to the board's composition or procedure (cf. United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952)), and there is no showing that plaintiff was at all prejudiced in its presentations by any act or omission of the board.

For the reasons stated, plaintiff's motion for summary judgment is herewith denied. Defendant's cross-motion for summary judgment is granted, plaintiff's petition is dismissed, and judgment is entered in favor of defendant on its counterclaim in the sum of five thousand five hunderd fifty-three dollars and ninety-two cents ($5,553.92).