**HANNON ELECTRIC COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–3834C.

United States Court of Federal Claims.

April 29, 1994.

from more than sedentary employment even though the individual was capable of activities beyond mere self care.

Donald C. Holmes, Easton, MD, for plaintiff.

John Warshawsky, with whom were Asst. Atty. Gen. Frank W. Hunger, and David M. Cohen, Washington, DC, and Kim Churchill, of counsel, Bremerton, WA, for defendant.

OPINION

BRUGGINK, Judge.

This action, brought pursuant to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601–613 (1988), is before the court following trial. The contractor, Hannon Electric Company was default terminated before the contract's completion date for failure to make progress. Hannon has brought suit seeking to have the default set aside. Trial was held February 7–10, 1994, in Cleveland. For the following reasons the court sustains the default.

### BACKGROUND FACTS [1]

On July 20, 1988, the Navy awarded Hannon Electric contract number N00406–88–C–1098, which was a contract to build six electrical testing devices known as "load banks" for the Naval Supply Center ("NSC"), Puget Sound in Bremerton Washington. Load banks are devices used to test repaired or refurbished electrical generators on ships. The Navy uses them to evaluate the generator and its circuitry to ascertain whether it maintains an output within a given range without surges or drops. The load bank generates a great deal of heat during testing.

The original contract completion date was May 15, 1989. Due to agreed-upon extensions that date was moved to October 19, 1989. On September 15, 1989, 34 days before the contract's October 19 delivery date, the government issued a cure notice. The major defect cited was that Hannon's nearly-completed load banks were larger than the contract allowed, thus making them difficult to transport. Hannon's response regarding this issue convinced the government that Hannon was unwilling and unable to reduce the size of the load banks. The contracting

officer ("CO"), Geraldine Watson, concluded that Hannon would not deliver complying load banks by the due date or any time after. She therefore terminated the contract for failure to make progress on October 6, 1989.

The contract specified that "[f]or transportability, load banks shall be rectangular in shape, with approximate dimensions of 6 wide, 4 high, 7 long, and approximate weight of [8000] pounds." [2] Def.Exh. 1 p. 5, ¶ 3.1.2. NSC intended that the load banks be approximately six feet by four feet by seven feet. The ones that Hannon had manufactured as of September 15, measured 9'4" by 4'4" by 10'4". [3]

The use of the word "approximate" and the failure to specify a unit of measurement invited difficulties. Nevertheless, the evidence established that Hannon understood what the government intended to convey. At trial, both Steven Harper, plaintiff's Vice President, and Jack Nigro, plaintiff's production manager, testified that Hannon had always understood that the government intended the missing unit of measurement to be feet. Hannon began to design the load banks in winter of 1988–89. The preliminary design drawings produced during that period indicated that Hannon's load banks would measure 72" by 48" by 84", i.e. six feet by four feet by seven feet. Hannon plainly was not confused by the absence of a unit of measurement; at the early design stage it intended to manufacture load banks that met the contract specifications.

In February 1989 Hannon became uncertain whether the contract allowed a choice between "block" and "incremental" loading, or whether it allowed both. Incremental loading permits the load bank to receive

---

1. This section provides the court's findings on only those facts most relevant to the dispute regarding the size of the load banks. Several issues arose during the course of contract performance, and were resolved prior to the issuance of the cure notice that led to the default termination. Hannon now contends that they are only relevant insofar as the Contracting Officer should have considered them as mitigating factors when considering whether to terminate the contract for default.

2. The original contract contained a typographical error that specified that the weight should be 800 pounds. Hannon's Vice President, Steven Harper, requested clarification and received it in Amendment 00003, which changed the weight to 8000 pounds.

3. Jack Nigro, plaintiff's production manager, measured the load banks, which Hannon has been keeping in storage, immediately before testifying. His measurements differed slightly from those recited in the cure notice, but still reflect a load bank that is substantially oversized.

power only in increasing steps, whereas block loading permits the load bank to receive power in one step. Hannon believed that the contract allowed it to choose one of the methods, and Hannon bid on the contract and commenced to perform it with the intention of providing only incremental loading. Jack Sweitzer, the Hannon engineer who was preparing the design drawings, questioned Hannon's original interpretation. He believed that the contract might actually require Hannon to provide both methods. The contract language that raised this issue states that "[t]he load bank shall be capable of either incremental or block loading of the alternators or generators being tested." Def.Exh. 1 at 10. On February 3rd, Hannon placed an order with a subsidiary for the components that it would need to provide both methods of loading in the event that the government did indeed require both.

On February 28, 1989 Hannon initiated a phone conference to resolve this issue and others. Mr. Harper and Mr. Nigro represented Hannon, and Robert Mecklenburg, Curt Lively, and Stuart Higgs represented the government. Although the government disputes whether Hannon raised the issue of the method of loading, the court found credible testimony by Mr. Harper and Mr. Nigro that they did ask the government whether the contract required both methods. The government informed Hannon that it desired both incremental and block loading, and Hannon changed its plans accordingly.

Mr. Sweitzer, with Mr. Nigro's approval, decided to accommodate the addition of block loading to his design by making the load banks larger. Smaller load banks present difficult engineering problems and are more expensive to manufacture than larger ones. If a load bank's components are packaged in a large container, the heat generated during testing is less likely to harm them. If the design calls for a smaller load bank, the manufacturer finds it more challenging to devise ways to dissipate heat and to make the components accessible for service.

When Mr. Nigro chose to increase the size of its load banks he was aware that they would no longer meet the contract's size requirements. The final design drawings that Mr. Sweitzer produced in March 1989 showed dimensions of 9'4" by 4'4" by 10'4", which eventually were the actual dimensions of the load banks that Hannon completed. Mr. Nigro testified that when he saw the dimensions:

> I thought about it, and I knew they were oversized, but due to the size of the components, the arrangement, air flow, accessibility for service and maintenance, that coupled with the dimensions listed in the specifications as being approximate, I felt they weren't critical so we decided to go ahead with it.

Tran. 692–93. Hannon did not inform the government of its decision to make oversized load banks or of its belief that the inclusion of both block and incremental loading required this change.

Hannon's failure to discuss the size change with the government reflected its mistaken belief that the contract's size requirement was not important to the government. Hannon read the lack of units of measurements and the use of the word "approximate" as indications of a lack of concern about the size of the unit. Steven Harper, Hannon's Vice President testified that:

> Our thoughts on it were that since it was written not to exceed dimension, [sic] and since it said approximately and there was no unit of measure, that size apparently was not a big concern of the Navy's.

Tran. 145; *see also id.*, 233, 692–93.

In June, the shipyard issued a modification to another load bank contractor after the contractor had requested clarification of its block and incremental loading specification, which read the same as the one in Hannon's contract. The modification stated that the government was changing the contract to include both block and incremental loading and that the contractor would pay the contractor more in consideration for this change. The evidence indicates the government's discussions with this other contractor caused David Briggs, the government's contract administrator, to become concerned with how Hannon was approaching this issue.

He decided to have his technical staff ascertain Hannon's intentions. In a telephone

conversation with Mr. Nigro, Mr. Briggs elicited Hannon's plans by asking whether Hannon intended to use a certain component for "both" incremental and block loading. Mr. Nigro replied that it did so intend, thus incidentally informing the government that Hannon was planning to provide both incremental and block loading.

Although Mr. Briggs was certain at that point that Hannon planned to provide both methods of loading, he decided to clarify the specification anyway, and did so in Modification P00003. His reasoning was that because specification problems on load bank contracts had cost the government money in the past, it was best to clarify the contract at that stage to avoid any claims based on ambiguity. When the government issued modification P00003, it accidentally included an internal memorandum that expressed Mr. Briggs' reasoning and referred to the inclusion of both methods as a change rather than a clarification. The modification stated, however, that it was a clarification and provided no additional consideration.

Although Hannon previously had begun to build the load banks to include both methods of loading without protest,[4] when it signed P00003 it included a reservation of its right to claim that the modification had increased the cost of performance. Mr. Briggs was aware that Hannon was claiming that including both methods of loading increased its cost of performance. Hannon did not inform the government that it believed that inclusion of both methods also necessitated a size increase. The government eventually signed P00003 with the reservation, and it became effective on July 21.

During this same period, Raymond C. Schallenberger, the government's quality assurance representative, discovered that Hannon was building oversized load banks. He testified initially that he visited plaintiffs' fabricating subcontractor in May or June of 1989. Further examination narrowed the date to sometime after June 16. During that visit he measured the framework for the load

banks that the subcontractor was manufacturing and discovered that Hannon's load banks would be larger than allowed by the contract. He testified that he informed Mr. Briggs of this problem and that Mr. Briggs replied that he would inform his technical personnel and get back to Mr. Schallenberger. Mr. Briggs never replied, however. Mr. Schallenberger testified that he informed no one besides Mr. Briggs, and his discovery does not appear to have been communicated beyond Mr. Briggs. None of plaintiffs' personnel were on hand to observe Mr. Schallenberger's discovery, and he did not inform plaintiff of it. None of the evidence presented indicated that Hannon was aware of the government's knowledge of the load banks' dimensions. Furthermore, nothing indicates that the government acted on Mr. Schallenberger's discovery.

On September 1, 1989, Mr. Schallenberger and Andy Hudak, a government engineer, visited Hannon. They noted that the nearly-finished load banks were oversized. Mr. Hudak informed the contract administrator, Michelle Richter, of this fact. She called the Puget Sound Shipyard and informed Curt Lively, who was an engineer in the procurement section. He told her to tell the contractor not to ship the load banks, as they were untransportable, an action that was later approved by his supervisor.

This action reflected the importance of the size requirement to the government. Hannon had miscalculated in reading a lack of concern for size into the contract. As the contract specified, the government needed load banks of the size indicated "[f]or transportability." John Broome, an engineer at NSC, testified that the size requirement was based on the shipyard's desire to use seven-ton forklifts to transport the load banks. The shipyard possessed many such forklifts and they were readily available when needed. He testified that the shipyard probably could have transported Hannon's over-sized load banks with a ten-ton forklift. The shipyard owned only five of these, however, and two

---

4. Although Hannon had been certain since February that the government required both methods, this was the first time that it explicitly indicated that it considered this requirement to be a

change. Mr. Harper did, however, contend that he referred to it implicitly in several letters. The context and wording of the letters did not clearly indicate that he did so.

are usually broken down at any given time. Personnel using the load banks might have had to wait up to a day and a half to secure one, as they were in great demand. If the width of the load banks' enclosure had been under eighty-four inches, the Navy also could have transported them with devices known as straddle trucks. Although straddle trucks usually can be secured at the shipyard more quickly than ten-ton forklifts, the government preferred seven-ton forklifts as they offered a greater savings of time and money. Thus, the size specification was no arbitrary requirement. It was central to the load banks' usefulness.

The CO testified that the discovery of non-compliance so close to the due date raised serious questions. She therefore issued a cure notice shortly thereafter on September 15th. The notice stated[5] that:

> [The contract] specifies in part that, "... load banks shall be rectangular in shape, with approximate dimensions of 6 wide, 4 high, 7 long, ...." DCASMA Cleveland has informed this office that the dimensions of the load banks being manufactured by Hannon under this contract measure 9.85' wide, 10.35' long, and 4.35' high. Your width dimension exceeds the specified contract dimension by more than 50%, and the specified length dimension by nearly 50%. Approximate is defined as: (1) being nearly, or more or less, as specified; (2) nearly exact. Your dimensions cannot be construed as being nearly or more or less or nearly exact to the dimensions specified in the contract. As a result of your design, your loadbanks cannot be transported from work site to work site in an efficient manner. Special crane and rigging services would be needed to transport your units.

Def.Exh. 28.

Even in the face of this clear indication that the government found the size requirement critical and was prepared to insist on it, Mr. Harper's written response of September 19, 1989 reflected a continued belief that size was not an important element of the contract:

> [The contract] states "... load banks shall be rectangular in shape, with approximate dimensions of 6 wide, 4 high, 7 long, ...." The load banks are rectangular. No guide is given in the specifications as to what unit of measurement the government had in mind, whether inches, feet, yards, meters or etc. Modification P00003 significantly increased the size of the load bank.

Def.Exh. 29. This statement comprises the whole of Hannon's response to the government on the size issue. Hannon did not request more information or offer to cure or, at least, to alter its performance as it did in its responses to other issues raised by the cure notice. The court finds that the reference to a lack of a unit of measurement was a contrived rationale for non-compliance. In addition, this was the first time Hannon informed the government that it believed that modification P00003, which clarified that the contract required both block and incremental loading, had increased the size of the unit.

After receiving Hannon's response, the CO and her staff considered Hannon's response and determined that it was without merit. With regard to Hannon's comments on the units of measurement, the government concluded that "Hannon's statement is illogical." Def.Exh. 30 at 1. The technology did not exist to make a unit that measured six by four by seven inches, and measuring in yards or meters would not have produced a unit transportable by forklift as required by the contract. The government also noted that the load banks' actual measurements did not approximate six by four by seven of any commonly-used units of measurement. The government also considered and rejected Hannon's assertion that P00003 increased the size of the load banks. It noted that modification P00003 was a clarification rather than a change, and that, in any event, addition of the components for either block or incremental loading to the design would not require

---

5. The cure notice also cited other defects: The weight of the control panel was greater than allowed and Hannon's test procedures were deficient in certain respects. The CO characterized these as "secondary concerns," Tran. 627, and testified that size "was the major issue that made my decision" to terminate the contract, Tran. 637. The government made no effort to sustain the termination on these other grounds at trial.

Hannon to increase the total volume by 200 percent.

To the government, Hannon's response "indicated that as far as [Hannon was] concerned, there was no specification for size." Briggs Deposition p. 83.[6] The CO testified that

Hannon did not respond in a manner in which I felt that they could repair and make a unit that was serviceable. Their response was vague. It mentioned that it had to be rectangular in shape, and that as a result of P00003 it caused that dilemma. That was unacceptable to us because there is no indication that hey, let's work on this, let's see if we can make it fit. . . . [T]here was no recognition that we had a major concern with size.

Tran. 633.

After considering Hannon's response to the cure notice and concluding that Hannon was unable or unwilling to comply with this essential requirement, the CO decided to terminate the contract for default. On October 6, 1994, 13 days before the load banks were due, the government informed Hannon that it was terminating the contract for default. The reason stated was that Hannon had failed to cure the conditions described in the cure notice that were endangering performance.

In his deposition, Mr. Briggs testified that in the deliberations that led to the CO's decision to terminate for default, her staff focused on Hannon's response to the cure notice "which indicated they weren't going to repackage, they were going to deliver us load banks that were 50 to 60 percent larger than specified." Briggs Depo. at 82. Both Mr. Brigg's deposition and the CO's testimony indicated that the CO and her staff were convinced that Hannon would never deliver conforming load banks. The Shipyard's personnel had advised Ms. Watson that the load banks as manufactured were not transportable.

Ms. Watson's decision was thus a product of her belief that Hannon intended to deliver untransportable load banks. Accordingly, she did not consider whether Hannon would perform more quickly than a reprocurement contractor as she did not believe that Hannon would ever comply. She concluded that there was no point in waiting to terminate the contract because Hannon would not comply and because cutting off performance would prevent Hannon from wasting money on finishing non-complying load banks.

After the termination Hannon continued to speak with the government in an attempt to secure reinstatement of the contract. It did not, however, offer to comply with the size requirement. Instead it attempted to ascertain what the government could "live with," and offered to reduce the width slightly to allow transport by straddle trucks. The CO found this response unsatisfactory and declined to reinstate the contract. The CO concluded that even after the termination "I was not comfortable that they were willing to spend the money and the time to make the unit in the manner in which the contract required." Tran. 633. Mr. Broome testified that he had advised his supervisors on this matter and agreed with the CO's decision not to reinstate:

[I]t was my judgment that Hannon wasn't negotiating in good faith. We were going back and forth, . . . and we weren't getting any resolution. When we would make a statement, Hannon rather than trying to meet us on the point, would . . . [indicate] . . . 'you don't know what you're talking about. We know what you need. Go ahead and take it and be done with it,' and we weren't getting anywhere.

Tran. 107–08.

Hannon has brought this suit requesting that the court overturn the termination for default. Hannon contends that it was not in default on the contract, as its actions had not endangered performance. Hannon further contends that even if it was in default, the default was excused because the government constructively changed the contract, constructively waived the size specification, and failed to issue an adequate cure notice. Han-

**6.** David Briggs, who was the Contracting Officer on this contract until June 1989 and thereafter the Contract Administrator, was recovering from a serious injury at the time of trial. By agreement of the parties, the court admitted his deposition.

non also asserts that even if it was inexcusably in default on the contract, the CO's decisions to terminate the contract and subsequent refusal to reinstate it were arbitrary and capricious.

## DISCUSSION

■ The government terminated its contract with Hannon under the provision of the default clause that allows termination if a contractor's failure to make progress that endangers performance. *See* 48 C.F.R. 52.-249–8(a)(1)(ii). To sustain this decision, defendant bears the burden of proving that Hannon's actions actually had endangered performance. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir. 1987). Hannon bears the burden of proving that the default was excused. *See, e.g., Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 602 F.2d 950 (1979) (holding that the contractor had failed to meet its burden of establishing that the government waived the due date). Hannon also bears the burden of demonstrating that the CO abused her discretion by deciding to terminate the contract and by deciding subsequently not to reinstate it. *Darwin Constr. Co. v. United States*, 811 F.2d 593, 598 (Fed.Cir.1987).

### A. *Failure to Make Progress*

■ A default termination for failure to make progress is "appropriate if a demonstrated lack of diligence indicated that the government could not be assured of timely completion." *Discount Co. v. United States*, 213 Ct.Cl. 567, 575, 554 F.2d 435, 441, *cert. denied*, 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977). These circumstances occur where the contractor's actions have led the contracting officer to believe reasonably "that there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance.'" *Lisbon Contractors*, 828 F.2d at 765 (quoting *RFI Shield–Rooms*, ASBCA Nos. 17374, 17991, 77–2

BCA ¶ 12,714 at 61,735, 1977 WL 2320 (1977)).

■ In most instances in which the government alleges a progress failure, the government contends that the contractor had fallen so far behind schedule that timely completion had become unlikely. *See, e.g., Lisbon*, 828 F.2d 759; *Discount Co.*, 213 Ct.Cl. 567, 554 F.2d 435; *Universal Fiberglass Corp. v. United States*, 210 Ct.Cl. 206, 537 F.2d 393 (1976). In such cases courts will not uphold a default unless the CO has carefully examined the contractor's ability to complete the remaining work before the contract completion date. *See, e.g., Lisbon*, 828 F.2d at 765–66. The evidence shows that the CO developed her belief that Hannon would not properly complete the contract by focusing on Hannon's response to the cure notice, and did not carefully examine Hannon's ability to complete the contract by the October 19th due date. Hannon urges that the default should be overturned because of this failure.

■ This case is somewhat different, however, from cases in which performance was endangered by the contractor's untimely performance. Here, Hannon had nearly completed performance, but had not performed in accord with the specifications.[7] Where the government has default terminated a contract for failure to make progress because of defective work, courts focus on whether circumstances indicated that the contractor possessed the intent or the ability to cure its defective performance in the time remaining. *See, e.g., International Verbatim Reporters, Inc. v. United States*, 9 Cl.Ct. 710, 723 (1986). In such cases, courts have held that a termination for default is justified if the contractor fails to respond to a cure notice by adequately assuring the government that it will take corrective action. *Id.* (upholding default termination where contractor failed after issuance of cure notice to assure government that it would take steps to correct inadequate performance); *see also Tubular Aircraft Products, Inc. v. United States*, 566 F.2d 1190 (Table), 213 Ct.Cl. 749, 750 (1977)

7. Hannon has not disputed that its load banks as constructed do not conform to the contract's size requirement.

(adopting opinion of the trial judge printed at 23 CCF ¶ 81,327) (same); *Composite Laminates, Inc. v. United States,* 27 Fed.Cl. 310, 323 (1992) (denying summary judgment because material issue of fact existed as to whether contractor provided adequate assurances of proper performance). In this case, as the CO testified, the cure notice was prompted by serious questions raised by Hannon's failure to comply. Thus, the CO's failure to examine Hannon's ability to complete the contract by the due date is not fatal to her finding that Hannon was in default if the government has demonstrated that Hannon did not provide adequate assurance that it would correct its defective work.

The court finds that the government's evaluation of Hannon's response to the cure notice was reasonable. The situation called for a more forthright response from Hannon. Hannon's indication that it was uncertain what units of measurement the contract required was illogical, given the state of technology, other contract provisions, and the actual size of Hannon's load banks. Furthermore, Hannon had always understood that the proper unit of measurement was feet and that its load banks were oversized. Hannon's feigned confusion as to the unit's proper size was disingenuous.

Hannon's contention that providing both incremental and block loading caused a size increase also was not responsive. The government had communicated to Hannon that it viewed P00003 as only a clarification. When Hannon first raised the issue in February 1989, the parties discussed it as a clarification rather than a change. Before the government issued P00003 it ascertained that Hannon was planning to provide both methods of·loading, and when it issued the document its stated purpose was to clarify the contract. Although the memorandum accidentally included with P00003 did describe the correction as a change, everything else indicated that the government viewed this as a clarification. The absence of consideration was perhaps the clearest indicator of this view. The government knew that Hannon was aware that it would not expect P00003 to have changed the size of the load banks because it did not understand P00003 as

making any change to the contract. In this context, Hannon's mere assertion that P00003 "significantly increased" the size was inadequate. It only further justified the government's understanding of Hannon's response as indicating that Hannon did not intend to abide by the size requirement.

Furthermore, in contrast to the letter's responses to other issues raised by the cure notice, Hannon did not request further information or offer a solution that would more closely conform to the specifications. Instead, Hannon offered its statement as a full response, stating at the end of its letter: "[w]e believe the foregoing answers are fully responsive to your Cure Notice. Therefore, performance is not endangered." Def.Exh. 29.

Despite this assertion, Hannon's reply failed to address the concerns expressed in the government's cure notice. It did nothing to quell the questions raised by its manufacture of oversized load banks. In fact, given the serious context, the tone and substance of Hannon's statement reasonably led the government to believe that Hannon was asserting that it had done all that the contract required of it in this regard. A further reasonable inference was that Hannon did not intend to, or could not, comply. The court recognizes that Hannon may have responded as it did because of frustration and surprise at discovering that it had done so much work based on a mistaken belief that size was not important to the government. At that point, however, Hannon should have realized that the government was serious about the size requirement and was expecting Hannon to offer to correct the size of the units or to offer a detailed excuse. The absence of either offer led the government to conclude reasonably that Hannon intended to stand by the load banks as manufactured.

The court holds that the government has demonstrated that Hannon was in default. Hannon's response did not assure the CO that Hannon would correct the oversized condition of its load banks. Instead, the CO reasonably construed Hannon's response as indicating that as far as Hannon was concerned, there was no specification for size. Thus, Hannon's response to the govern-

ment's cure notice "indicated that the government could not be assured of timely completion." *Discount Co.*, 213 Ct.Cl. at 575, 554 F.2d at 441.

Furthermore, the evidence showed that Hannon in fact did not intend to reduce the size of its load banks. Mr. Nigro testified that Hannon could not have made a load bank that complied with the contract's size requirements. He testified that although he could have reduced the width substantially, he could not have concurrently reduced the length. He said that a load bank that met the contract's size requirement would be inefficient, and that he "would not have wanted to" build such a load bank. Tran. 705. Thus, the government's belief that Hannon did not intend to and could not comply with the size requirement was not only reasonable but also correct.

Despite Mr. Nigro's assertion that Hannon could not have built load banks that met the contract's size specifications, Hannon does not contend that the size specification was impossible to perform. In fact, Hannon presented evidence regarding the reprocurement contract awarded to Simplex. Hannon's own evidence showed that Simplex was able, after significant delay, to produce a load bank that complied with the reprocurement contract's requirements, which were the same as those imposed on Hannon. Although the specifications produced a working load bank, the government ultimately agreed with Hannon's assessment that the accessibility of the components for maintenance and service left something to be desired. The government chose, however, to alter the design by other means than increasing the size of the load banks. Instead, it issued a contract modification that provided additional consideration to Simplex to change slightly the internal design of the load banks to ensure that the components would be more serviceable.

Hannon also contends that under the *Radiation Technology* doctrine the government should have allowed it additional time to correct its performance. *See Radiation Technology, Inc. v. United States*, 177 Ct.Cl. 227, 366 F.2d 1003 (1966). This contention fails because evidence showed that Hannon knew that its load banks did not meet the contract's size requirements. To obtain the extra time granted under this doctrine, the contractor must show, among other things, that it reasonably believed that it was delivering conforming goods. *See, e.g., Pelliccia v. United States*, 208 Ct.Cl. 278, 525 F.2d 1035 (1975) (upholding denial of extra time to contractor who unreasonably believed that specifications had been waived). Here, the evidence indicated that Hannon actually knew that its performance did not comply with the contract. Therefore, the court holds that Hannon was not entitled to additional time to correct its performance.

### B. *Excuses*

#### 1. *Constructive Change—Incremental and Block Loading*

Hannon contends that when the government insisted that Hannon provide both incremental and block loading it constructively changed the contract. The government counters that the contract always required both methods. The language that gave rise to this issue reads: "The load bank shall be capable of either incremental or block loading of the alternators or generators being tested." Def.Exh. 1 at 10.

Plaintiffs' argument on this issue focuses on the "either ... or" formulation of the requirement. It contends that the government cannot ask for "either" and expect to receive both. Thus, when the government insisted on receiving both, it constructively changed the contract requirements. This argument ignores, however, the presence of the word "capable" in the requirement. The government did not ask for either a unit with incremental loading or a unit with block-loading. Rather, it asked for a unit that was "capable of either" method of loading. Hannon mistakenly assumed that it could build load banks "capable of" only one method.

If the contract was at all ambiguous on this point, the ambiguity was patent. Thus Hannon was obliged to seek clarification from the government before bidding on the contract. *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 6, 314 F.2d 501, 504 (1963). Having failed to do so, the ambiguity

will be "taken against [it] in interpreting the contract." *Id.*

■ Although "it is not the actual knowledge of the contractor, but the obviousness of the discrepancy that imposes the duty of inquiry," *Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972), the actions of Hannon's personnel demonstrate the obviousness of the ambiguity. Mr. Nigro testified that in early February 1989 one of Hannon's engineers, Jack Sweitzer, raised the possibility that the contract might require Hannon to provide both methods. Mr. Nigro was sufficiently impressed with the possibility that he ordered the parts necessary for both methods and asked the government for clarification. Thus, Hannon was able to discern two possible interpretations of the language. Each possibility was strong enough to induce Hannon to act; it began performance based on the first, and then moved to alter its performance based on the second. Unfortunately, Hannon discerned the second possibility after it had bid and entered the contract. Nevertheless, both possibilities always were present.

### 2. *Waiver*

■ According to Hannon, once Mr. Schallenberger discovered Hannon's noncomplying performance, defendant had a duty to inform Hannon that it was performing incorrectly, or to deal with Hannon reasonably once this issue came to light. In support of these contentions Hannon offers a line of cases that discuss the effect of the government's failure to object when it discovers that a contractor's interpretation or performance of a contract differs from the government's expectations. Such a failure may affect the obligations of the parties, but not in the precise manner that Hannon suggests.

The government's unprotesting observation or acceptance of performance that it later contends was incorrect can have one of two legal consequences. *See* John Cibinic, Jr., *Constructive Waiver of Specifications; Coat of Many Colors,* 6 Nash & Cibinic Rep. ¶ 43 at 107–110, 111 (1992). First, if the interpretation of ambiguous specifications is in dispute, such actions serve to show that

the contractor's interpretation is reasonable and that the government shared the contractor's interpretation of the specifications before the dispute arose. *See id.* at 111. In this context, the contractor need prove little more than the fact that such conduct occurred. It need not show that it relied on the government's conduct, or that the actions were those of a government official with authority to waive contract requirements.

Several of the cases cited by Hannon belong to this category, including *Maxwell Dynamometer Co. v. United States,* 181 Ct.Cl. 607, 386 F.2d 855 (1967) (finding that the government's unprotesting observation of a test was evidence that the contractor had reasonably interpreted the contract's test procedure requirements). *See also Transtechnology Corp. v. United States,* 22 Cl.Ct. 349 (1990) (finding that government inspectors' examination and acceptance of performance was evidence of reasonableness of contractor's interpretation); *BRS Contracting Co.,* GSBCA No. 7945, 89–2 BCA ¶ 21,-884, 1989 WL 53633 (1989) (finding that government's failure to repudiate contractor's interpretation confirmed its reasonableness). In this line of cases, the government's inaction serves to buttress a court's holding that the contractor's interpretation of a contract requirement was reasonable where it first has held that the requirement was ambiguous.

In this case, Hannon cannot argue that the government's lack of objection demonstrates that it was acting on a reasonable interpretation of the contract requirements because the ambiguity in the contract's size requirements did not mislead Hannon. As the evidence indicates, Hannon was never confused as to the proper unit of measurement and knew that its load banks would be over-sized. Furthermore, the size of Hannon's load banks are not indicative of a reasonable interpretation of the size requirement. Although the use of the word "approximately" allowed for some imprecision in fulfilling the specification, a reasonable contractor would have understood that six, four, and seven were the touchstones for the loadbanks' dimensions. Webster's defines "approximately" as "reasonably close to." *Webster's Third*

*International Dictionary.* Thus, the specification communicated that the loadbanks' dimensions should approach those indicated by the contract. The dimensions of Hannon's load banks were not "reasonably close to" six by four by seven of any commonly-used units of measurements.

■ A contractor also can use the government's unprotesting observation or acceptance of noncontractual performance to demonstrate that the government has waived a contract requirement. Professor John Cibinic has named this argument the "constructive waiver of specifications." John Cibinic, Jr., *Constructive Waiver of Specifications: Coat of Many Colors,* 6 Nash & Cibinic Rep. ¶ 43 (1992); *see Miller Elevator Co. v. United States,* 30 Fed.Cl. 662 (1994) (adopting this description). A constructive waiver of specifications occurs not where the contract is ambiguous, but, rather, where the government "has administered an initially unambiguous contract in such a way as to give a reasonably intelligent and alert opposite party the impression that a contract requirement has been suspended or waived." *Gresham & Co. v. United States,* 200 Ct.Cl. 97, 120, 470 F.2d 542, 555 (1972).

■ The standard is more demanding in this category of cases, as the contractor is attempting to prove that it was entitled to deviate from the exact terms of the contract. To prove that a constructive waiver has occurred, a plaintiff must demonstrate four elements: "(1) The CO had notice that the work differed from contract requirements. (2) Action or inaction of the CO indicated that the non-specification performance was acceptable. (3) The contractor relied on the CO's action or inaction. (4) It would be unfair to permit the Government to retract the waiver." Cibinic, *supra,* at 107; *see Miller Elevator,* at 687–88 (adopting this formulation of the standard).

■ Plaintiff's argument as to this theory also fails. Its key flaw is its failure to prove that it relied upon the government's inaction. *See Universal Sportswear, Inc. v. United States,* 145 Ct.Cl. 209, 180 F.Supp. 391 (1959) (finding waiver of contract requirement where plaintiff relied on government's con-

duct); *Atlas Grinding & Machine Corp,* ASBCA No. 33011, 87–1 BCA ¶ 19,612 at 99,218, 1987 WL 40614 (1987) (same). Plaintiff failed to establish that any of its personnel knew that Mr. Schallenberger had measured the load bank. He testified without contradiction that none of plaintiff's personnel saw him take the measurements and that he did not inform plaintiff of doing so. Mr. Nigro stated that his decision to go ahead with the oversized load banks was based on the perceived vagueness of the contract and his belief that a sound design demanded a bigger load bank. None of the evidence presented indicated that Hannon believed that defendant acquiesced to its noncontractual performance, or even that plaintiff believed that defendant was aware of such performance.

Without reliance, plaintiff cannot prove that the government constructively waived the contract's size requirements. Plaintiff contends, however, that even if the government could still demand that plaintiff strictly comply with the contract's size requirements, it owed plaintiff a special duty to be accommodating once the size issue arose. The cases cited by plaintiff do not support this contention. Absent any reliance by plaintiff, defendant owed plaintiff no extraordinary duty.

■ A contractor that knowingly disregards contract requirements in favor of its own judgment does so at its own peril. "Regardless of the technical soundness of the [g]overnment's requirements, a contractor must comply with them and cannot substitute its own views for that of the government." *Maxwell Dynamometer,* 181 Ct.Cl. at 628, 386 F.2d at 868. Well-established precedent holds that the government is entitled to strict compliance when it contracts for goods. *Madigan v. Hobin Lumber Co.,* 986 F.2d 1401, 1403–04 (Fed.Cir.1993). The fact that the government, unbeknownst to the contractor, discovers the non-contractual performance does not shift the fault for it to the government.

In this case, Hannon made a conscious decision to disregard the contract's size requirements. As the Court of Claims noted in *Johnson Controls, Inc. v. United States,* 229

Ct.Cl. 445, 461, 671 F.2d 1312, 1321 (Ct.Cl. 1982): "[I]f a contractor embarks on a ruinous course, it is a journey to completion that was taken with eyes wide open." In that case, the contractor's reliance on the government's actions "preterminated plaintiff's journey along its ruinous course, and in effect save[d] it ... from its own sins." *Id.* Hannon has failed to demonstrate that it relied on the actions of the government. Thus, it cannot be saved from its own error. The government's discovery of Hannon's noncontractual performance has no effect.

### 3. *Adequacy of Cure Notice*

██ Hannon also contends that defendant's cure notice was inadequate. Hannon asserts that it did not advise Hannon what specific performance was required to cure the load bank's defects and did not give adequate time to cure.

██ A cure notice is "intended to inform the contractor that it has failed to meet one or more terms of the contract." *International Verbatim Reporters,* 9 Cl.Ct. at 721. To do so adequately it "must list with enough particularity the performance failures which have placed the contract in danger of termination for default." *Id.*

The cure notice here sets forth the problems that the government had with Hannon's performance. With regard to the size problem, the government informed Hannon of the percentage by which the load banks exceeded requirements, defined the specification's use of the word "approximately," and stated that because of their excessive dimensions, the government could not transport the load banks efficiently. Defendant did what the regulations required. It thoroughly defined the parameters of the problem. Hannon was then in the best position to determine what specific performance would cure the problem. The cure notice was adequate.

As for whether the cure notice gave adequate time to cure, "this court will not substitute its judgment for that of defendant." *International Verbatim Reporters,* 9 Cl.Ct. at 723 n. 7 (citing *Northrop Carolina, Inc. v. United States,* 213 Ct.Cl. 670, 553 F.2d 105 (1977)). The CO allowed the required minimum of 10 days in the notice, and actually waited 19 days before terminating the contract. Hannon has not demonstrated that her choice of this amount of time was arbitrary or capricious. The CO testified that the timing of her actions was intended to save the government time and Hannon wasted effort. Hannon had not offered to comply and was not working to reduce the size of the load banks. This was not a circumstance in which Hannon was trying to cure its defective performance but was cut short by the end of the cure period.

### C. *Exercise of Discretion*

#### 1. *Decision to Terminate for Default*

██ Plaintiff also asserts that the default termination was improper because the CO failed to properly exercise her discretion to terminate and because her decision did not have a reasonable basis. This court evaluates the CO's conduct to determine if it was arbitrary, capricious, or an abuse of discretion. *Darwin Constr.,* 811 F.2d at 597. Even if a contractor is technically in default, a CO may not automatically terminate the contract. *See id.* Instead, she must consider whether such action is in the best interest of the government. *Nuclear Research Corp. v. United States,* 814 F.2d 647, 649 (Fed.Cir. 1987). She does so in part by considering the seven factors set out in 48 C.F.R. § 49–402–3(f). *Fairfield Scientific Corp. v. United States,* 222 Ct.Cl. 167, 182, 611 F.2d 854, 862 (1979).

██ Plaintiff has focused on two of these factors in claiming that the CO abused her discretion. The first of them required her to consider "[t]he urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor." 49 C.F.R. § 49.402–3(f)(4). The CO testified that she did not recall making an inquiry into the urgency of the need for these load banks, or into the time it would take a contractor to perform a reprocurement compared to the time it would take Hannon to complete the work. The documentation surrounding the decision to terminate does not indicate that any such inquiry was made.

In determining whether a CO has properly exercised her discretion in light of this factor, courts have held that the plaintiff has established an abuse of discretion if the evidence shows that the CO failed to make specific inquiries into the amount of time it would take the contractor to finish versus the amount of time a reprocurement would take. *See, e.g., Lisbon,* 828 F.2d at 766. In this case, however, such an inquiry was not needed, because the CO had already reasonably determined that Hannon was either unwilling or unable to complete performance in accord with the contract's size requirements. Thus, the comparative inquiry contemplated by the regulation would have been futile. The regulation presumes a contractor that is willing and able to deliver complying goods. Hannon was not.

Hannon also contends that the CO did not consider properly "[t]he specific failure of the contractor and the excuses for the failure." 49 C.F.R. § 49.402–3(f)(2). The evidence shows, however, that the CO and her staff carefully examined Hannon's response to the cure notice, and addressed all of the excuses that Hannon offered. As discussed above, the CO reasonably found Hannon's answer unresponsive. Her decision to terminate for default is not an abuse of discretion on this basis.

Hannon also contends that the CO should have investigated several other issues that arose during performance and considered them as mitigating circumstances. In rough chronological order, these issues are as follows: First, an amendment to the solicitation created an ambiguity as to whether the contract required electrical wiring in a "delta" or "Y" configuration, and Hannon sought and received clarification. Second, as discussed above, Hannon found it necessary to seek clarification of the block and incremental loading requirement. Third, the parties disputed whether the contract allowed subcontracting and whether it provided for progress payments. Fourth, the parties had difficulties regarding what the contract's quality assurance provisions required of Hannon. Fifth, the contract requirements regarding cleaning and painting referred to repealed or missing FAR clauses, and Hannon had to seek clarification from the government.

All of these issues were resolved before September 1989, and Hannon has conceded in its post-trial briefing that any excusable delay caused by these events was addressed by Modification P00003. Nevertheless, Hannon contends that they were relevant to the CO's decision to terminate. The court already has discussed the relevance of the incremental/block loading issue. As for the rest, the court finds that they were not relevant to the CO's determination, and thus it was not an abuse of discretion for the CO not to consider them. The motivating factor in the CO's decision was the size of the load banks. None of these other issues affected size at all. In fact, Hannon decided to manufacture oversized load banks before most of them arose. Although they occupied much time at trial, and the court recognizes that they were a source of frustration for the parties, they did not affect the final outcome of the contract.

Hannon further contends that the CO abused her discretion because she did not consider accepting non-complying performance. The right of the government to receive strict compliance when it contracts for goods is, however, well-established. *Madigan v. Hobin Lumber Co.,* 986 F.2d at 1403–04. This doctrine is tempered somewhat by the application of the substantial compliance doctrine. Thus, in construction contracts, the government may be required to accept slightly non-conforming work in exchange for a price reduction, *see Granite Constr. Co. v. United States,* 962 F.2d 998, 1006–07 (Fed. Cir.1992), *cert denied,* —— U.S. ——, 113 S.Ct. 965, 122 L.Ed.2d 121 (1993), and in contracts for the purchase of goods, it may be required to allow reasonable time to correct minor defects, *see Radiation Tech.,* 177 Ct.Cl. 227, 366 F.2d 1003. The rationale underlying the doctrine is the avoidance of economic waste. *See Granite Constr.,* 962 F.2d at 1007. This rationale has never, however, been extended to apply to goods that do not substantially comply with the contract. Hannon's load banks exceeded both the width and height specifications by approximately 50%. They were not transportable

by means that the government had planned to use. These were not minor defects; Hannon did not substantially comply with the contract.

Nevertheless, Hannon claims that the CO should have asked more probing questions of her technical staff and discovered what the government actually needed. Such solicitousness was not, however, warranted in light of Hannon's response to the cure notice. Mrs. Watson's technical staff had informed her that Hannon's load banks were not transportable as manufactured except by crane. Hannon had responded in a way that indicated that it intended to stand by the load banks as manufactured, and had not offered any alternatives. She was not unreasonable to decline to explore alternatives when Hannon had made such an inquiry seem pointless.

■ Hannon also contends that the CO acted arbitrary and capriciously by failing to forward a copy of the cure notice to the Small Business Administration ("SBA") as required by 48 C.F.R. § 49.402–3(e)(4). Such a failure is not grounds for overturning a default where, as here, notice is provided to SBA only "as a matter of information," and plaintiff has not demonstrated that the lack of notice prejudiced it. *McQuiston Associates*, ASBCA No. 24676, 83–1 BCA ¶ 16,187, 1982 WL 7944 (1982).

2. *Decision Not to Reinstate the Contract*

■ After the contract was terminated, Hannon wrote to the government asking that the CO reconsider her decision. Hannon contends that the CO's refusal to reinstate the terminated contract is further evidence that she abused her discretion.

A CO may reinstate a terminated contract if "[c]ircumstances clearly indicate a requirement for the terminated items" and "[r]einstatement is advantageous to the Government." 48 C.F.R. 49.102(d) (1993). This decision lies wholly within the discretion of the CO. *International Foods Retort Co.*, ASBCA Nos. 34954 et al., 92–2 BCA ¶ 24,994 (1992). As such, this court may only set it aside if plaintiff demonstrates that it was arbitrary or capricious. *See Darwin Constr.*, 811 F.2d at 597–98 (1987) (discussing the

scope of review of administrative decisions in cases arising out of government contracts).

After the contract was terminated, Hannon continued to fail to demonstrate that it was willing and able to comply with the contract requirements. None of Hannon's post-termination communications indicated that Hannon was prepared to deliver load banks that even arguably complied with the contract's size requirement. In fact, Hannon never acknowledged that the contract required such dimensions. Instead, Hannon attempted to ascertain what the government "could live with." Defendant's contract administrator, David Briggs, indicated that Hannon could obtain reconsideration by writing a letter that exhibited an intent to comply with the contract and that specified how it would cure the existing problems. Hannon's reply did not meet this description. Instead, it offered to reduce the width of the load banks to 96″ so that the government could transport them with straddle trucks. In the alternative, Hannon offered to "explore the possibilities available" if the government informed it of the maximum acceptable size.

None of these discussions indicated that reinstatement was advantageous to the government. The size of the load banks inversely corresponded to their usefulness, and the government had indicated that the excessive size of Hannon's product was the government's key concern. Nevertheless, Hannon continued to demonstrate that it failed to understand the importance of the contract's size requirements. At this point, the CO was not unreasonable in concluding that Hannon was unwilling to spend the time and money necessary to cure its load banks. As Mr. Broome noted, even after the default, Hannon's statements displayed an attitude that Hannon knew better than the government what would fulfill its needs. Under these circumstances, the CO's refusal to reinstate the contract was not arbitrary and capricious.

*CONCLUSION*

The government has proven that Hannon was in default on the contract. Hannon has failed to demonstrate that the default was excused. It also has not demonstrated that

the CO's decisions to terminate the contract and, then, not to reinstate it were arbitrary and capricious. The court therefore upholds the termination for default. The Clerk is directed to enter judgment dismissing the complaint.