DAVIES PRECISION MACHINING,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–825C.

United States Court of Federal Claims.

May 21, 1996.

Fred Barakat, Chadds Ford, Pennsylvania, attorney of record, for plaintiff.

John S. Groat, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, attorney of record, for defendant.

## DECISION

HARKINS, Senior Judge:

After a protracted and convoluted pretrial preparation period, plaintiff's claims came before the court on cross-motions for summary judgment; oral argument was heard on January 31, 1996. This case presents novel legal issues involved in the small purchase procedures that have been established by the Defense Logistics Agency (DLA), and the relationship of those procedures to requirements of the Contract Disputes Act of 1978 (CDA).

Davies Precision Machining, Inc., located in Lebanon, Pennsylvania, was founded in 1978, and since that time has participated in Government procurements directed at small businesses. It claims a niche in the small purchase procurement system that is characterized by high difficulty machining contracts that involve unstable materials, such as plastics, narrow tolerances, castings and forgings. Plaintiff participated in DLA unilateral small purchase procurements and bilateral procurements administered by the Defense Construction Supply Center (DCSC), Directorate of Contracting and Production, located in Columbus, Ohio. During the period January 1, 1989, to October 23, 1992, the total value of end items sold to the DLA exceeded $7 million.

Plaintiff's initial complaint, filed December 2, 1992, involved three unilateral small purchase procurements in Counts I (No. –7451), II (No. –7489), and III (No. –F019). The first amended complaint, filed January 27, 1993, added, in Counts IV through VIII, one unilateral purchase procurement (No. –U620) and two bilateral procurements (No. –1944 and No. –2046). The initial complaint and the first amended complaint concerned pro-

curements that had been entered during the period July 2, 1990, through February 11, 1992. They had been terminated for nondelivery (lapse) or for default between December 4, 1991, and September 17, 1992.

The following table shows the complete DLA numbers for the procurements, dates of entry and termination, counts in the first amended complaint, and other data.

| Procurement | Date | Item | Amount | Type | Complaint | Termination |
|---|---|---|---|---|---|---|
| DLA–700–90–C–1944 | 7/2/90 | 3 sediment strainers | Unit: $15,655<br>Total: $46,965 | Bilateral RFP | Counts IV, V and VI | 1/31/92<br>Default |
| DLA–760–91–M–F019 | 2/5/91 | 8 ball & seat kits | Unit: $290<br>Total: $2,320 | Unilateral RFQ | Count III | 12/13/91<br>Lapse |
| DLA–750–91–M–7451 | 4/5/91 | 2 cylinders (submarine hydraulic gear) | Unit: $465<br>Total $930 | Unilateral Oral | Count I | 12/4/91<br>Lapse |
| DLA–750–91–M–7489 | 4/11/91 | 2 cylinders (submarine hydraulic gear) | Unit: $465<br>Total: $930 | Unilateral Oral | Count II | 12/4/91<br>Lapse |
| DLA–760–91–C–2046 | 4/22/91 | 4 valve seats | Unit: $13,790<br>Total: $55,160 | Bilateral RFP | Count VIII | 4/21/92<br>Default |
| DLA–760–92–M–U620 | 2/11/92 | 6 ball valve 1½″ | Unit: $2,950<br>Total: $17,700 | Unilateral RFQ | Count VII | 9/17/92<br>Cancelled |

On September 8, 1992, DLA gave plaintiff a notice of proposed debarment based on an investigation that placed plaintiff on the DLA CM/UPS list (counterfeit material/unauthorized product substitution). Investigation of plaintiff apparently involved 30 small business procurements, 15 of which were the basis for debarment. The proposed debarment included allegations of fraud, poor quality, and delinquent performance. The four unilateral purchase orders and two bilateral procurements in plaintiff's initial complaint and first amended complaint were among the 15 procurements on which the proposed debarment was based.

Plaintiff's debarment period was for 15 months after the September 8, 1992, notice. Plaintiff initially sought to oppose the proposed debarment. Defendant's supporting documentation for its January 29, 1993, motion to dismiss for lack of subject matter jurisdiction included a letter dated November 6, 1992, from plaintiff to DLA in response to the notice of proposed debarment.

Defendant's January 29, 1993, motion to dismiss for lack of subject matter jurisdiction noted that the three counts in plaintiff's initial complaint claimed only $4,180 damages. Defendant argued that the nominal amount of damages "strongly suggests that this suit is nothing more than a blatant artifice to collaterally attack the pending debarment proceedings." Plaintiff, after opposing the proposed debarment for 10 months, elected to abandon its opposition.

Plaintiff's December 2, 1992, complaint was amended on January 27, 1993, and on February 16, 1996. As amended, the complaint includes paragraphs 3 and paragraphs 7 through 11. Paragraph 3 alleges a dispute arose in 1989, between the DCSC contracting officer (CO) and plaintiff, concerning a contract for the supply of pistons. Paragraphs 7 through 11 allege DCSC embarked upon a series of retaliatory acts in bad faith designed to frustrate plaintiff's performance on all of its other DCSC contracts; was dilatory in contract administration; refused to grant delivery extensions, deviations, waivers or changes; and caused plaintiff's delinquency. The CO was charged with outrageous conduct in terminating procurements so as to maximize the harm to plaintiff.

At the January 31, 1996, argument, plaintiff declared paragraphs 7 through 11 had not been abandoned. Although plaintiff recognized those actions could not be resolved on summary judgment, plaintiff argued that the case could be resolved on summary judgment. Plaintiff's position on these charges is: if plaintiff's motion for summary judg-

ment is not allowed, neither can defendant's motion for summary judgment be allowed "because these allegations raised in paragraphs 7 through 11 present significant factual issues that need to be tried."

Pretrial preparation of plaintiff's claims has advanced through three phases. These phases have involved voluminous documentation and excessive time consumption.

*Phase 1*

The period December 2, 1992, to December 3, 1993, was concerned with documentation in support of defendant's January 29, 1993, motion to dismiss, for lack of subject matter jurisdiction (RCFC 12(b)(1)); plaintiff's August 6, 1993, motion for summary judgment, on counts III, IV, V, VII and VIII; and defendant's September 29, 1993, partial motion to dismiss counts I, II, III, V, VI and VII for lack of subject matter jurisdiction (RCFC 12(b)(1)) and for summary judgment on counts IV and VIII.

These motions came before the court for oral argument on April 19, 1994. During argument it was established that counsel had failed to prepare an adequate record. There were no contract documents for procurements No. –U620 (count VII), No. –1944 (counts IV, V and VI), and No. –2046 (count VIII); documentation of administrative action on waiver requests and actions by the Quality Assurance Representative (QAR) on unilateral purchase orders was incomplete, No. –7451 (count I), No. –7489 (count II), No. –F019 (count III), and No. –U620 (count VII). Other deficiencies included failure to cite or provide relevant portions of the DCSC Small Purchase Procedure regulations to implement the FAR, the DoD FAR Supplement (DFARS), the Defense Logistics Acquisition Regulation (DLAR), and the DCSC Master Solicitation document. As a result, numerous material issues of fact were in dispute. Both parties' motions for summary judgment had to be denied.

The April 20, 1994, order after oral argument, however, did determine the RCFC 12(b)(1) subject matter jurisdiction issue. The order on that issue stated:

Defendant's motion to dismiss was pursuant to RCFC 12(b)(1), lack of subject matter jurisdiction. During the course of argument, it was pointed out that defendant's motion to dismiss reflects a persistent confusion over the meaning of "jurisdiction" as that term applies to claims against the United States under the Tucker Act, and to contract claims under the Contract Disputes Act. Defendant fails to recognize and distinguish the two distinct meanings of "jurisdiction" that apply in claims against the Government. As explained below, for purposes of dismissal on the pleadings under RCFC 12(b)(1), the amended complaint states claims within the subject matter jurisdiction of this court.

In claims arising under the Tucker Act and the CDA, issues relative to sovereign capacity and consent to be sued cloud jurisdictional concepts. Subject matter jurisdiction relates to the area of substantive law that Congress has empowered the court to adjudicate. The exercise of subject matter jurisdiction, in claims against the Government, is further restricted in particular cases by specific facts that implicate the consent of the sovereign to be sued. As a consequence, the term "jurisdiction" has been given at least two distinct meanings. First, the court's general powers to adjudicate in specific areas of substantive law—subject matter jurisdiction. Second, the jurisdiction of the court in a particular case to exercise its general power on the facts peculiar to a specific claim. *See Spruill v. Merit Sys. Protection Bd.,* 978 F.2d 679, 686–89 (Fed.Cir. 1992); *Bray v. United States,* 785 F.2d 989, 992 (Fed.Cir.1986). A party may fail to state a claim on which relief can be granted when the facts relevant to the particular claim show it to be barred by limitations under 28 U.S.C. § 2501, barred by limitations under 41 U.S.C. § 609(a)(3), or a failure to satisfy CDA requirements applicable to identification of a claim, 41 U.S.C. § 605(a), or a CO's decision, 41 U.S.C. § 609(a)(1).

Claims based upon contract traditionally have been within the general Tucker Act jurisdiction of the Court of Claims and this court. For decades, the Supreme Court has interpreted the Tucker Act as having

provided a waiver of sovereign immunity in claims founded upon any express or implied contract with the United States. *United States v. Mitchell*, 463 U.S. 206, 215 [103 S.Ct. 2961, 2966–67, 77 L.Ed.2d 580] (1983). The requirements specified in the CDA do not limit the subject matter jurisdiction of the court. *Bray*, 785 F.2d at 992.

"Subject-matter jurisdiction of the federal courts is initially determined according to the 'well-pleaded complaint.'" *Allied–General Nuclear Serv. v. United States*, 839 F.2d 1572, 1575 (Fed.Cir.), *cert. denied*, 488 U.S. 819 [109 S.Ct. 61, 102 L.Ed.2d 39] (1988) (citing *Gronholz v. Sears, Roebuck & Co.*, 836 F.2d 515 (Fed. Cir.1987)). In the amended complaint, plaintiff alleges contract claims under contracts made by DLA and DCSC.

For purposes of dismissal on the pleadings under RCFC 12(b)(1), the amended complaint states claims within the subject matter jurisdiction of this court. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 [94 S.Ct. 1683, 1686, 40 L.Ed.2d 90] (1974); *Bell v. Hood*, 327 U.S. 678, 682 [66 S.Ct. 773, 776, 90 L.Ed. 939] (1946); *Mindes v. Seaman*, 453 F.2d 197, 198 (5th Cir.1971); *Bray*, 785 F.2d at 992; *Merck & Co. v. United States*, 24 Cl.Ct. 73, 77–79 (1991).

On the basis of the foregoing, defendant's motion to dismiss is treated as a motion pursuant to RCFC 12(b)(4), failure to state a claim upon which relief can be granted. Defendant's motion to dismiss was not confined to facts alleged in the amended complaint, and matters outside the pleadings are not excluded by the court. Pursuant to RCFC 12(b), defendant's motion is treated as for summary judgment.

*Phase 2*

To overcome the deficiencies in the record that counsel had presented, a further briefing schedule was established in the April 20, 1994, order. Counsel were directed to submit briefs on the following:

A. Authority, procedures, and method of operation, as applicable to the claims in the amended complaint, for the DCSC small purchase program, with copies of relevant documents, particularly including a copy of DCSC Master Solicitation—Small Purchase, June 1989.

B. Does the CDA apply to the small purchase program in situations where the time for performance under a DCSC offer for a unilateral contract for supplies has expired by its terms, with no delivery?

C. Analysis of relevant precedent of Boards of Contract Appeals, relative to the criterion of "substantial performance" and concepts of "revival after lapse" of an offer for a unilateral contract.

D. Analysis of any judicial precedent *See Forway Industries, Inc. v. United States*, Docket No. 113–78 (Ct.Cl. June 22, 1979) (LEXIS, Genfed Library, Claims file).

E. Analysis of FAR, Part 13—Small Purchase and Other Simplified Procedures, sections 13.101, 13.106, and 13.108(b), with particular attention to the meaning and content of a supplier's "acceptance" by proceeding with the work to the point "where substantial performance has occurred." When does a contract come into existence under the FAR small purchase program?

F. For purposes of the CDA, is a notice by the Contracting Officer of the lapse of an offer for a unilateral contract a decision under 41 U.S.C. § 609(a)(1)?

Response to these questions was completed on September 15, 1994. Plaintiff's response was supported by an appendix in two volumes that contained 11 additional exhibits. Defendant's response was supported by an appendix in two volumes that contained 10 additional exhibits on 629 pages.

DLA's small purchase procedure during the period 1990–92 was the product of procurement policies and administrative techniques that had developed in the Office of Federal Procurement Policy after 1974 (41 U.S.C. §§ 401, 405 (1988)), and prior thereto in the Armed Services Procurement Regulations (ASPR) of the Defense Department. 41 U.S.C. § 151 et seq. (1952). Small business procurements and small purchase setasides are founded on specific statutory requirements. 15 U.S.C. § 644 (1988).

The Federal Acquisition Regulations System (FAR) is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies. The FAR is published in 48 C.F.R., Chapters 1–29. The federal acquisition system primarily consists of the regulations published in FAR, and agency acquisition regulations that implement or supplement the FAR. The FAR does not include internal agency guidance of the type described in FAR § 1.301(a)(2). 48 C.F.R. § 1.101.

Agency heads may issue or authorize the issuance of acquisition regulations that implement or supplement the FAR. On compliance with specified statutory limitations (FAR § 1.301(c)), an agency head may issue or authorize the issuance of internal agency guidance at any organizational level (e.g., designations and delegations of authority, assignments of responsibilities, work-flow procedures, and internal reporting requirements). 48 C.F.R. § 1.301(a)(2). Issuances by agency heads under FAR § 1.301(a)(2) need not be published in the Federal Register, but if appropriate findings are made, agency heads may be required to so publish. 48 C.F.R. §§ 1.301(b) and 1.303(b).

DLA's small purchase procedure is based on FAR Part 13. 48 C.F.R. §§ 13.101–13.109, 13.5. This authority is implemented by DFARS, 48 C.F.R. §§ 213.000–213.507, and DLAR § 4105.1 Part 13. On March 22, 1984, DLA issued the Small Purchase Desk Guide (SPDG), to implement FAR, DFARS and DLAR. In 1992, the SPDG was renamed the Small Purchase Procedure Manual (SPPM). The SPPM in Section VII includes the DCSC Master Solicitation—Small Purchase. The June 1989 edition of the DCSC Master Solicitation applies to procurements No. –F019, No. –7451, and No. –7489. The January 1992 Master Solicitation applies to procurement No. –U620.

The SPPM provides guidance to DCSC procurement officials on virtually all matters that may arise in the small purchase program. It is a complex collection of the minutiae applicable to procurements; its provisions occupy 395 pages in the appendix. Procedures in the SPPM are evolving. Between March 22, 1984, and December 3, 1993, there were 19 revisions, each of which amended, superseded, or updated various provisions in its Sections I through VIII. Structurally, the SPPM covers general instructions (Sec. I), guidance on topics to be covered by requests for quotations (Sec. III, subsections A–J), guidance on topics to be considered in evaluations and in making awards (Sec. IV, subsections A–S), guidance for completion of Form 1155 (Sec. V), guidance for completion of special clauses (Sec. VI, subsections A01–S01), Master Solicitation (Sec. VII), Forms (Sec. VIII), and Code 13 and Code 64 administration (Sec. IX and Sec. X).

The function of the SPPM is to establish a simplified administrative procedure that permits a multitude of procurements with as little supporting documentation as may be necessary to define the line item, establish price and delivery obligations, and incorporate clauses required by statute or relevant to the specific purchase of goods or services.

The DCSC Master Solicitation—Small Purchase (SPPM, Sec. VII) is an effort to provide a simplified award document by elimination of the need to include repetitive provisions and clauses in each solicitation and order. The DCSC Master Solicitation—Small Purchase in Part I includes the text of solicitation provisions, with citations to source, that apply to Requests for Quotations (RFQ). Part II contains the text of special clauses prescribed for fixed-price supply and service contracts that are applicable to bilateral purchase orders. Part III contains the text of special clauses that are applicable to RFQs and resulting orders, referenced by alphabetical categories—A1A(1) through (34) applicable to all orders, through category S01.

 The FAR and DFARS are issued under statutory authority and published in conformance with required statutory and regulatory procedures. FAR § 1.301(b). Accordingly, those regulations have the force and effect of law. *See Newport News Shipbuilding & Dry Dock Co. v. Garrett,* 6 F.3d 1547, 1552 (Fed.Cir.1993) (FAR § 33.207(c)(2) was binding on courts, not merely an interpretive regulation.); *G.L. Christian & Associates v. United States,* 160

Ct.Cl. 1, 12, 312 F.2d 418 *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963) (ASPR required inclusion of standard clauses that contract did not incorporate.). The DLAR § 4105.1, Part 13, the SPPM and the DCSC Master Solicitation—Small Purchase have not been so published. As such, during the contract years in issue, they are internal procedures that apply to agency acquisitions of supplies and services.

The RFQs and Orders in procurements No. –F019, No. –7451, No. –7489 and No. –U620 were overprinted to incorporate by reference special clauses A1A–A1D, D01–D06, F01, M01–M07, N03 and N05 in Part III of the DCSC Master Solicitation. The overprint in the order in procurement No. –U620 also included Q05 (Data—English Language). The continuation sheets in the RFQs (RFQ MAT 1) did not incorporate the bilateral order clauses from Part II of the DCSC Master Solicitation. Plaintiff was not requested and did not provide written acceptance to the RFQs. Each of the purchase order procurements was unilateral.

Part 13 of the FAR, entitled "Small Purchase and Other Simplified Purchase Procedures," prescribes policies and procedures for the acquisition of supplies and services from commercial sources, the aggregate amount of which does not exceed $25,000. 48 C.F.R. § 13.000 (1993). Its purpose is to prescribe simplified procedures for small purchases in order to (1) reduce administrative costs and (2) improve opportunities for small business concerns ... to obtain a fair proportion of Government contracts. § 13.102. Contracting officers shall use the small purchase procedure that is most suitable, efficient, and economical in the circumstances. § 13.104. Purchases not exceeding $2,500 may be made without securing competitive quotations if the contracting officer considers the prices to be reasonable. For purchases over $2,500, contracting officers shall solicit quotations from a reasonable number of sources to promote competition to the maximum extent practicable. Generally, solicitation of at least three sources may be considered to promote competition to the maximum extent practicable. Generally, quotations should be solicited orally; written

solicitations should be used when oral quotations are not considered economical or practical. § 13.106(b)(2).

Except when quotations are solicited orally, Standard Form 18, or an agency designed conforming substitute, is used to obtain price, delivery, and related information from suppliers. Continuation sheets when additional space is needed are standardized. § 13.107(a).

The legal effect of quotations relative to contractual concepts of offer and acceptance is defined specifically in FAR § 13.108:

—A quotation is not an offer and, consequently, cannot be accepted by the Government to form a binding contract. § 13.108(a).

—Issuance by the Government of an order for supplies and services in response to a supplier's quotation does not establish a contract. § 13.108(a).

—The Government's order in response to the supplier's quotation is an offer to the supplier to buy certain supplies or services on specified terms and conditions. § 13.108(a).

—By written notice to the supplier, at any time before acceptance occurs, the Government may withdraw, amend, or cancel the offer that is based on an order resulting from a quotation. § 13.108(c).

—Acceptance of the Government's offer may be indicated by the supplier in writing, if so requested by the CO, by furnishing the supplies or services ordered, or "by proceeding with the work to the point where substantial performance has occurred." § 13.108(b).

Principles applicable to administration of purchase order procedures are established in FAR Subpart 13.5. Provisions relative to price, discounts, quantities, inspection procedures, F.o.b. destination, determinable delivery date, are included in FAR § 13.501. Procedures for written acceptance by the supplier and modifications by the CO of purchase orders are provided in FAR § 13.503.

A purchase order that has not been accepted in writing may be cancelled by the CO. In such event, the CO "shall notify the contractor in writing that the purchase order

has been cancelled," and "request the contractor's written acceptance of the cancellation." § 13.504(b). If the contractor does not accept the cancellation, or claims the costs were incurred as a result of beginning performance, the CO shall process the termination action as prescribed in FAR Part 49. § 13.504(b)(2).

The procedures detailed in the SPPM and DCSC Master Solicitation comply with the administrative principles required by the FAR. The DLA small purchase program administered by DCSC contracting personnel accords with FAR standards.

The SPPM in Sec. III provides guidance to DCSC buyers in locating potential suppliers. Oral or written requests for quotations may be made to potential sources that are located by examination of: contracts and work sheets filed by national stock numbers (NSN), trailer sheets showing past purchases of the item, Bidders Mailing List, Thomas Register, telephone Yellow Pages, and by displaying solicitations of less than $5,000. SPPM at 3–1. For procurements of over $2,500, the SPPM states the buyers should solicit "an average of three contractors." SPPM at 3–2. Telephone solicitations are encouraged for all procurements anticipated to be under $10,000 that the buyer deems appropriate. In telephone solicitations, the buyer must inform the contractor of everything that might affect price and/or delivery to be quoted, such as inspection requirements, desired delivery, packaging, destinations, and numbers and quantities of line items. SPPM at 3–21. Factors to be considered in evaluation of a quotation include examination of the Suspended/Debarred list, and the related internal CM/UPS list. SPPM at 4–8.

■ The CDA sets forth a comprehensive framework for resolving disputes arising between the Government and its contractors. The CDA applies to all express or implied contracts entered into by executive agencies for the procurement of goods and services. 41 U.S.C. § 602(a). Unilateral purchase orders for goods are subject to the CDA, once performance in accordance with the Government's terms and conditions is tendered. A contractor's commencement of performance

pursuant to the Government's purchase orders creates irrevocable option contracts to accept the Government's offers. The Armed Services Board of Contract Appeals (ASBCA) has exercised jurisdiction over disputes relative to such option contracts, e.g., *Sunshine Cordage Corp.*, ASBCA No. 38,904, 90–1 BCA ¶ 22,382, at 112,472, 1989 WL 127715. Since a contract was created, the CDA applies.

■ Once an option contract is created, the Government's offer becomes irrevocable, and the CDA continues to apply after the date for delivery until the DCSC unilateral offer has expired by its terms. The lapse of that transaction, resulting from the offeree's failure to render substantial performance, does not expunge the existence of the option contract. Once a contractor has substantially performed pursuant to a unilateral purchase order, the Government's offer to buy has been accepted. FAR § 13.108(b). Unilateral purchase orders constitute offers by the Government which a contractor can accept by delivering the requested goods in accordance with the terms and conditions specified in the order. *Klass Eng'g, Inc.*, ASBCA No. 22,052, 78–2 BCA ¶ 13,236, 1978 WL 2186, *aff'd on recon.*, 78–2 BCA ¶ 13,463, 1978 WL 2205.

A unilateral contract that results from an RFQ or from an oral solicitation from DCSC incorporates by reference specific provisions and special clauses, including the Disputes article. Clause A1A(23) of the DCSC Master Solicitation reads in part as follows:

*Disputes* (APR 1984) FAR 52.233–1:

(a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601–613) (the Act).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

Controversies arising under the small purchase program rarely come to the attention of either courts or of the BCAs. In most cases the amount involved is too small to justify the expense of litigation. The only judicial precedent on point is *Forway Indus., Inc. v. United States*, No. 113–78 (Ct.Cl.

June 22, 1979) (LEXIS, Genfed Library, Claims File). There the withdrawal of a purchase order was alleged to constitute a breach of contract. Defendant moved for summary judgment and argued that the purchase order was merely an offer of a unilateral contract which lapsed when there was a failure of performance by the due date. Defendant cited decisions of the ASBCA to support its position. The Court of Claims declined to resolve the claim by summary judgment procedures. The court's order stated:

> The court hesitates, however, to decide issues of first impression based on such a fragmentary record as is now before it. We believe that a trial is necessary to clarify the underlying facts and to delimit the legal questions which we are here asked to decide. We therefore deny defendant's motion.

The clarification of facts and delineation of legal issues, however, was not realized. The $4,232 claim ultimately was settled by stipulation and judgment was entered for plaintiff in the amount of $2,000.

The ASBCA, and other boards, have considered the criterion of "substantial performance" as an element of acceptance of the Government's unilateral contract offer, and the concept of "revival after lapse" of that offer. The ASBCA decisions were pursuant to ASBCA Rule 11 and thus were on the record without a hearing. Documentary evidence in the Rule 4 appeal file could be supplemented by affidavits, depositions, admissions, answers to interrogatories, and stipulations.

The ASBCA has held that the undertaking of a substantial part of the requested performance, such as placing orders with manufacturers or vendors without making any tender, regardless of any express promise or notification of acceptance, binds the Government and renders its offer irrevocable. *ITT Defense Communications Div. Defense— Space Group*, ASBCA No. 13,420, 69–1 BCA ¶ 7548, 1969 WL 646. The ASBCA has noted that the offeror's liability under its promise is conditional on full consideration being given, and, if the contractor does not tender the complete performance requested under the terms of the offer, the offer expires and the unilateral contract may be cancelled. *P.E.C. Corp.*, ASBCA No. 13,709, 69–1 BCA ¶ 7559, 1969 WL 648. The Government may breach the unilateral contract if it prematurely revokes an irrevocable offer or if it otherwise prevents performance by refusing a tender. *Klass*, 78–2 BCA at 64,717 (*citing* RESTATEMENT CONTRACTS, § 45, comment b). The General Services Board of Contract Appeals (GSBCA) has held that, when a contractor repeatedly affirmed its intent to perform through subcontracting for the item, testing the item, and assuring the Government that delivery would take place, substantial performance had occurred. *University Sys., Inc. v. Department of Commerce*, GSBCA No. 10,896–COM, 92–3 BCA ¶ 25,182, 1992 WL 137689.

■ Once purchase orders lapse, they can be revived by words or conduct of the Government seeking or encouraging continued performance. Once the Government revives its offer, it remains open for the time specified, or if no time is specified, for a reasonable time. *Klass*, 78–2 BCA at 64,718. In *Klass*, this occurred when the Government inquired about the status of deliveries, and again when the Government encouraged continued performance and suggested corrective measures in a telephone conversation. *Id.* The Government also has been held to have revived its offer by inspecting and rejecting a shipment, returning it to the contractor, and then requesting a written explanation for the discrepancies and corrective action necessary for future shipments. *L & D Industries, Inc.*, ASBCA No. 38,239, 91–2 BCA ¶ 23,718, 1990 WL 259374; *accord Penn Screw & Mach. Works*, ASBCA No. 32,382, 89–3 BCA ¶ 22,205, 1989 WL 102952 (modification relative to the type of marking to be used on an item issued after the delivery date revived Government's offer). These cases hold that revival of the lapsed offer requires an affirmative act on the part of the Government.

■ When there is no written acceptance of the purchase order, suppliers may accept the Government's offers by delivering the requested supplies in accordance with the specified terms and conditions. A supplier

may also indicate its mutual assent by beginning performance and, thus, "accept" an option contract, and the Government's offer becomes irrevocable. *Rex Sys., Inc.*, ASBCA No. 45,301, 93–3 BCA ¶26,065, 1993 WL 190365. The beginning of performance, however, does not amount to acceptance of an offer that results in the creation of a supply contract. Although the beginning of performance is sufficient to establish an option contract that makes the Government's offer irrevocable, it does not amount to acceptance of the offer for a supply contract. Once the contractor has substantially performed under the option, however, that contractor has accepted the Government's offer and a supply contract exists, because the supplier has proceeded with the work "to the point where substantial performance has occurred." Acceptance under FAR Part 13 is the completion of substantial performance. Whether a supplier is entitled to compensation is dependent on compliance with the delivery provisions, line item specification requirements, and requirements of provisions incorporated by reference.

*Phase 3*

Analysis of the materials accumulated in the record in Phase 1 and Phase 2 showed the evidence was incomplete to resolve whether plaintiff's performance in procurements No. –7451, No. –7489, No. –F019, and No. –U620 satisfied the substantiality test. In procurements No. –1944 and No. –2046, the correspondence, engineering reports, affidavits and deposition of the CO were insufficient to establish the basis on which the contracts had been rejected for nonconformity. These and other matters were discussed with counsel in a joint telephone conference held October 28, 1994.

A discovery scheduling order, which was based on counsel's recommendation, was entered on June 10, 1993. It authorized concurrent discovery to be completed on or before October 30, 1993. Very little discovery, however, had been undertaken and numerous factual issues lacked definition. Plaintiff contended that the issues on the claims in the initial and amended complaint, procedural and on the merits, could be resolved by summary judgment procedures. In order to locate factual materials and complete the documentary record, the discovery period was reopened by order on October 31, 1994, for a period of 60 days. Subsequently, requests to extend the discovery period to March 14, 1995, were allowed.

The October 31, 1994, order also established a schedule for plaintiff to file a motion for summary judgment and for defendant to file a response and a cross-motion for summary judgment. The briefing schedule provided all briefing was to be completed in 90 days. Briefing on the cross-motions was completed on September 11, 1995.

Pursuant to the October 31, 1994, order, it was not necessary to duplicate documentary exhibits previously filed with respect to the prior dispositive motions and the April 20, 1994, order after oral argument. Plaintiff's motion papers reference plaintiff's exhibits A through Z–5 and 15 of defendant's exhibits that had been previously filed on January 29, 1993. Plaintiff's exhibits A–A through L–L were filed after the October 31, 1994, order. Defendant's motion papers include 30 exhibits filed January 29, 1993, and exhibits in a 55–page attachment to defendant's proposed findings of uncontroverted fact filed September 29, 1993. Defendant on September 1, 1995, filed a 38–page appendix that included two exhibits.

*Discussion*

The oral argument on January 31, 1996, was concerned with plaintiff's motion for summary judgment under RCFC 56 on each of the four unilateral procurements and both of the bilateral procurements. Defendant's responsive motion was not in accord with the procedure established in the October 31, 1994, order. Defendant renewed its partial motion to dismiss each of the four unilateral procurements for lack of jurisdiction under RCFC 12(b). Defendant contended evidence in the record did not show the CO had made a final decision under the CDA on those procurements. Defendant's cross-motion also sought summary judgment under RCFC 56 on one count (Count IV—convert to termination for convenience) applicable to bilateral procurement No. –1944 and on Count VIII

applicable to bilateral procurement No. –2046.

■■■ Defendant's RCFC 12 motion to dismiss had been denied in the April 20, 1994, order, as to lack of subject matter jurisdiction (RCFC 12(b)(1)) and for failure to state a claim on which relief can be granted (RCFC 12(b)(4)). The motion to dismiss for failure to state a claim was treated as a motion for summary judgment under RCFC 56, which was denied because the motion papers were deficient and material issues of fact were in dispute. Defendant's motion to dismiss was considered as if filed under RCFC 12(b)(4), failure to state a claim upon which relief can be granted. With respect to a motion to dismiss under RCFC 12(b)(4), a complaint should not be dismissed for failure to state a claim upon which relief can be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court must "assume each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant." *Chang v. United States,* 859 F.2d 893, 894 (Fed.Cir.1988).

A motion under RCFC 12(b)(4) is treated as one for summary judgment and disposed of as provided in RCFC 56 when matters outside the pleadings are presented to and not excluded by the court. All parties shall be given reasonable opportunity to present all material made pertinent to such a motion by RCFC 56. In a specific case, in the absence of a full record after completion of discovery, summary judgment would be limited to the merits of the failure to state a cause of action. Inasmuch as additional information has been incorporated in the record during Phases 2 and 3, it is appropriate to expand the explanation that was given in the April 20, 1994, order.

Defendant's renewed motion for dismissal of the unilateral procurements under RCFC 12(b)(4) is grounded on the contention that the CO had not rendered final decisions under CDA (41 U.S.C. § 605), and as a consequence, plaintiff could not bring an action directly on the claim under the CDA (41 U.S.C. § 609(a)(1)). Defendant fails to recognize that cancellation of unilateral orders requires the CO to undertake positive action by the issuance of a notice in writing. FAR § 13.504(b). Defendant also does not give effect to the timing of the CO's termination actions in these procurements and the contractual status when claims were submitted to the CO.

All of the terminations were on standard forms utilized by DCSC and all termination orders were issued prior to the filing on December 2, 1992, of the initial complaint. Unilateral orders No. –7451 and No. –7489 were terminated on December 4, 1991, unilateral order No. –F019 was terminated on December 13, 1991, bilateral procurement No. –1944 was terminated on January 31, 1992, bilateral procurement No. –2046 was terminated on April 21, 1992, and unilateral order No. –U620 was cancelled on September 17, 1992. Each of these actions by the CO was final as to the procurement involved and conformed with DCSC practice in procurements under $100,000.

Plaintiff submitted claims to the CO for monetary relief on unilateral orders No. –7451, No. –7489, No. –F019, and No. –U620 on November 30, 1992, and on procurements No. –1944 and No. –2046 on December 2, 1992. The documentation in support of each of the claims consisted of (1) a letter signed by plaintiff's Vice President—Manufacturing that stated plaintiff objected to the termination, (2) a separate letter, signed by plaintiff's Vice President—Manufacturing and by plaintiff's President, that stated the attachment was a "termination claim," and added the CDA certification language, and (3) a completed Form 1435 Settlement Proposal.

On December 16, 1992, in a letter addressed to plaintiff's Vice President—Manufacturing, the CO listed under Subject:

| | |
|---|---|
| No. -F019 | No. -U620 |
| No. -2684 | No. -7489 |
| No. -7451 | No. -1944 |
| | No. -2046 |

The CO's letter stated:

Reference subject awards whereby you submitted Termination for Convenience proposed settlement costs.

The Government does not grant Termination for Convenience costs under contracts that were Terminated for Default or purchase orders that were withdrawn or cancelled.

The record does not contain documentation relative to procurement No. –2684. It is clear that the CO on December 16, 1992, took final action on the claims in all six procurements that are involved in this case.

The CDA provides in relevant part that: All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter. 41 U.S.C. § 605(a) (1994). Since the CDA does not specifically define the word "claim" the FAR definition must be used. *See Garrett v. General Elec. Co.*, 987 F.2d 747, 749 (Fed. Cir.1993). The FAR defines a "claim" as:

"a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant." FAR § 33.201.

The Federal Circuit has restated the interpretation of FAR § 33.201 in *Reflectone, Inc. v. Dalton. Dawco Constr., Inc. v. United States* had been the controlling case on the issue of what constituted a claim. *Dawco* held that a claim must be a demand for payment of an amount that has already been put in dispute. *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 877 (Fed.Cir.1991), overruled by, *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995). *Reflectone* eliminated the "amount that has already been put in dispute" requirement. *Reflectone*, 60 F.3d at 1579. The Federal Circuit noted that "the *Dawco* dispute requirement has proven to be

inimical to at least two goals of the CDA: providing for the *efficient* and *fair resolution* of contract claims." *Id.* at 1580 (emphasis added).

▮▮▮ *Reflectone* interprets FAR § 33.201 to call for the following three prerequisites: (1) a written demand; (2) seeking as a matter of right; and (3) the payment of money in a sum certain. Defendant argues that the elements of a claim under the CDA requires: (1) the letter to the CO requesting relief must specify relief desired; (2) the contractor must assert specific rights; (3) the letter must request a final decision from the CO; (4) the CO must have issued a final decision, or failed to issue such a decision within the statutory time periods; and (5) the letter must clearly indicate the amount of monetary compensation requested. Defendant cites *Dawco Constr., Inc.*, 930 F.2d at 872; *Essex Electro Eng'rs, Inc. v. United States*, 960 F.2d 1576, 1580 (Fed.Cir.), *cert. denied*, 506 U.S. 953, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992); *Reflectone, Inc. v. Kelso*, 34 F.3d 1031 (Fed.Cir.), *vacated and withdrawn*, (Fed.Cir.1994). Defendant's argument is too narrow a construction of the CDA requirements. "The statute's broad language demonstrates that as long as what the contractor desires by its submissions is a final decision, . . . the CDA claim test is met." *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1576 (Fed.Cir.1992).

The plaintiff also must certify the claim under CDA § 605(c) if the claim is over $50,000. The only procurement that qualifies for the certification requirement is procurement No. –2046, in total amount of $55,160. Plaintiff has satisfied this requirement. *Transamerica* stated the level of compliance with the statutory certification must be "substantial compliance with the statute and its purposes." *Transamerica*, 973 F.2d at 1580.

▮▮▮ Under the Federal Circuit restatement in *Reflectone* of the test for claim status, plaintiff's submissions constitute claims under the CDA. A claim need not be in any stringent form or contain any predetermined wording. It must be a "clear and unequivocal statement," however, that puts the CO on notice. Plaintiff's submissions put the CO on

notice that the plaintiff desired a contractual entitlement and/or reconsideration of the terminations of the purchase orders. Following *Reflectone's* test, the plaintiff's submissions must first be a written demand. The November 30th submissions for the purchase orders constitute written demands. The letter sent March 20th for No. –1944 constitutes a written demand. The December 2nd submission for No. –2046 constitutes a written demand. Second, the submission must be sought as a matter of right. *Reflectone* describes this as a " 'demand for something due or believed to be due.' " *Reflectone*, 60 F.3d at 1576 (citing WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 244 (1990)). All of the submissions were sent to the CO claiming what plaintiff believed to be its rightful due. Lastly, the submissions must reflect a sum certain. All of the submissions gave a financial listing, as well as referring to the contractual price as the desired amount of compensation. This certainly is a sum certain. Plaintiff's submissions, though not ordinary or conventional, meet the broad language requirements recently established by the Federal Circuit.

■ The December 16th letter is a final decision of the CO. A final decision does not need to include "boilerplate" language to constitute a final decision. "The decision is no less final because it failed to include boilerplate language usually present for the protection" of contract rights. *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed.Cir.1990).

The amended complaint as to each of the unilateral procurements states a cause of action on which relief may be given. Counts I, II, III and VII are not subject to dismissal under RCFC 12(b)(4) for failure to state a cause of action.

■ Where there has been adequate time for discovery, and there is an absence of evidence essential to support the nonmoving party's case, summary judgment is on the merits of the substantive claim. In this case, defendant's motion to dismiss and its cross-motion on summary judgment are deemed to be, and are treated as, a motion for summary judgment under RCFC 56(c) on all six procurements involved in the initial and amended complaints.

Summary judgment under RCFC 56(c) shall be rendered forthwith "if the pleadings, depositions, answers and interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law."

■ Summary disposition is appropriate to isolate and dispose of factually unsupported claims or defenses and there are no genuine disputes as to any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir. 1987). The movant has the burden of demonstrating that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). After adequate time for discovery and on motion, the movant can meet this burden by establishing that there is an absence of evidence on an essential element of the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). The fact that there are cross-motions for summary judgment does not mean the court must grant judgment as a matter of law for one side or the other. Each party's motion must be evaluated on its own merits. All reasonable inferences must be drawn against the party whose motion is under consideration. *Mingus Constructors, Inc.*, 812 F.2d at 1391. The non-movant must respond by producing affirmative evidence that a genuine issue of material fact does exist, and such an issue is determined to be genuine if a reasonable jury could resolve a factual matter in the non-movant's favor. *Sweats Fashions, Inc.*, 833 F.2d at 1562. Doubts as to whether there are material factual issues in dispute are to be resolved in the light most favorable to the party opposing the motion for summary judgment. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). "In order to defeat a

motion for summary judgment, the non-moving party must demonstrate more than some metaphysical doubt as to the material facts, instead it must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

Each of the six procurements was on standard forms that utilized the administrative mechanics that had been developed in the Defense Department to implement the ASPR. The contractual documentation consists of forms that when assembled provide: (1) standard requirements for supplier selection, and a schedule that defines with precision the line items procured, applicable military specifications, applicable drawings, quantities, delivery time and place, and pricing per unit and in total, and (2) lists that identify clauses required in all procurements, general clauses that apply to particular types of procurements, and optional clauses that are designated as appropriate for a particular procurement.

Some of the forms that comprise contract documentation relate to actions taken during the preaward period, and may have been completed subsequent to the action involved. When completed and assembled in a multi-page document that includes forms executed by the CO, that document defines the contractual obligations at the date of award. Post award actions are documented in forms that define amendments, modifications, or deletions of some or all of the parties' obligations.

The unilateral procurements, No. –F019, No. –7451, No. –7489, and No. –U620, were on forms designated for use in procurements of less than $25,000, FAR Part 13. The bilateral procurements were on forms designated for use in fixed-price negotiated procurements, FAR Part 15. The same Disputes article, FAR § 52.233–1 (Apr. 1984) was included in each of the six procurements. The special clauses listed in the DCSC Master Solicitation, Part II, applicable to bilateral purchase orders, included the same Changes article, FAR § 52.243–1, the same Default article, FAR § 52.249–8 (Apr. 1984),

and the same Termination for Convenience of the Government article (applicable to contracts of $100,000 or less), FAR § 52.249–1 (Apr. 1984), that were included in the fixed-price negotiated bilateral procurements No. –1944 and No. –2046. None of the unilateral procurements contained a Changes article, a Default article or a Termination for Convenience of the Government article.

■■■ Plaintiff's motion for summary judgment does not recognize that the acceptance of an offer for a unilateral supply contract that contains only a Disputes article does not create the same legal rights and obligations that arise in a bilateral procurement with the additional Changes, Default and Termination for Convenience articles. In the unilateral procurements, the provisions of the schedule relative to delivery time and compliance with line item specifications determines the supplier's obligations and cannot be changed absent action by the CO. Acceptance of the unilateral offer on the basis of substantial performance does not create a supply contract with the same flexibility as a procurement for supplies negotiated in response to an RFP. Commitments in the schedule of an order for a unilateral contract, whether based on an oral request or an RFQ, are rigid and controlling.

The unilateral procurements were terminated for lapse of the Government's offer on December 4, 1991, (No. –7451 and No. –7489), on December 13, 1991, (No. –F019), and one was cancelled on September 17, 1992 (No. –U620). By those termination dates, performance in each had been initiated, and other than in No. –U620, the work had been substantially performed. The bilateral procurements (No. –1944 and No. –2046) were terminated for default, respectively, on January 31, 1992, and April 21, 1992. Facts that determine the final decisions on the summary judgment motions follow.

*Nos. –7451 and –7489*

■■■ In response to oral quotations, the DLA issued as unilateral orders No. –7451 on April 5, 1991, and No. –7489 on April 11, 1991. Each order called for delivery of two cylinders, NSN 3010–01–196–5453 at a total price of $930, with delivery required by Octo-

ber 2, 1991 (No. –7451) and October 8, 1991 (No. –7489). The item description in each provided:

CYLINDER.

PART OF HYDRAULIC OPERATING GEAR USED ON SUBMARINE, SS593 CLASS.

EXCEPTION TO DRAWING: USE MIL–S–22698 IN LIEU OF MIL–S–20166.

CRITICAL APPLICATION ITEM

I/A/W SPEC NR MIL–S–22698C

BASIC DTD 88 JUN 29
AMEND NR 1 88 DEC 19

MIL–S–22698C covers ordinary strength and higher strength structural steel plates, shapes, and bars. Paragraph 6.6 of MIL–S–22698C provides that steel mills which have met first article test requirements of superseded specifications or which have the American Bureau of Shipping (ABS) source approval are to be considered as approved sources for the Navy, for the equivalent grades listed in 1.2.1 and Table II, provided approval is maintained in accordance with section 43 of the ABS rules. Steel mills which do not have ABS approval and which have met first article requirements of superseded specifications should obtain ABS source approval.

On November 8, 1991, plaintiff by letters advised the CO that the items were ready to ship but the QAR questioned the qualifications of the raw material supplier and requested a determination as to whether the material used to manufacture the cylinders was acceptable. Plaintiff attempted to show its supplier was qualified by means of a statement from the supplier which referenced a statement from an ABS local inspector. The QAR was unable to verify this statement. By letter dated November 15, 1991, the CO (1) afforded plaintiff the opportunity to provide documentation of source approval from ABS; and (2) informed plaintiff that, if the information was not received within 5 days after receipt of the letter, DLA would cancel the purchase order.

On December 3, 1991, the CO verified that the QAR had not received any documentation from plaintiff. The CO unilaterally modified the contracts on December 4, 1991, (PO0001)

on the standard forms in which the overprint includes: "Since the required delivery date was not met, the Government's offer to purchase has lapsed."

Plaintiff did not meet the delivery date in the unilateral offer because of a dispute as to the specification requirements. The QAR and the CO interpreted MIL–S–22698C to require the supplier of the steel used in the cylinders to have ABS source approval. Whether MIL–S–22698C applies only to Hull Structural Material is a mixed question of fact and law. The certification from plaintiff's steel supplier was based on a statement purportedly made by an ABS local inspector. Such hearsay is not adequate to resolve the issue of what the specification required. Plaintiff did not provide any documentation from ABS.

Plaintiff's motion for summary judgment must be denied because a material issue of fact is in dispute. Defendant is not entitled to judgment on these unilateral procurements because ¶ 6.6 of the specification in the record is inadequate to show that ABS source approval is required for the supplier that sold steel to plaintiff. No analysis was made of compliance in the order with SPPM Part 1, ¶ 25, Waiver of First Article Test (FAT), nor of the provisions of MIL–S–22698C applicable to First Article inspection, ¶¶ 4.3 and 6.3.

*No. –F019*

On December 19, 1990, DLA issued an RFQ for eight parts kits (NSN 4820–01–210–9590); the line item description included:

PARTS KIT, BALL VALVE. INCUDES 1 EACH BALL AND 2 EACH SEATS. BALL SURFACES TO BE PLATED BY ELECTROLIZING (.2000 TO .00025 INCH THICKNESS) QUALITY ASSURANCE PROVISION 140A 1MAR83 APPLIES.

I/A/W DWG NR 81316 2104388

BASIC DTD 64 MAR 13
AMEND NR H DTD 85 JUN 21
TYPE NUMBER PIECE 7 AND 9
DETAIL DRAWING

Unilateral order –F019, when issued February 5, 1991, included the same item description as in the RFQ. The order called

for delivery by August 4, 1991, of eight parts kits for a total price of $2,320.

The plating thickness (.2000 to .00025 inch) in the line item description in the RFQ and in the order was erroneous. Drawing No. 2104388H; however, stated all surfaces were to be plated at thickness .0002 to .00025 inch.

On March 8, 1991, the QAR sent to the CO a request for clarification of the plating thickness in the data package. The QAR referenced Fed.Spec. QQ–C–320 Rev. B. Amend 4 as more commonly used in this type of procurement. Paragraph 3.4.2. of QQ–C–320 provides that the maximum range for class 2 plating shall be as specified in the contract, purchase order, or applicable drawing. If not specified, the minimum thickness for the finished part shall be 0.002 inch.

On March 18, 1991, the CO requested the DCSC Directorate of Technical Operations (DCSC–STD) to clarify the plating thickness, and asked for review of QQ–C–320 for possible use. DCSC–STD's response continued and compounded the error with a statement that the thickness was to be .002 to .00025 and that the item description was correct. The CO found this response to be not clear and on April 15, 1991, re-sent the request to DCSC–STD. On May 6, 1991, DCSC–STD sent the CO a new description which provided for thicknesses of .002 to .0025.

On May 10, 1991, the CO issued Modification PO0001 to correct the item description for Clins 1 and 2 by changing the parenthesis to (.002 to .0025 inch thickness). By letter dated May 24, 1991, plaintiff stated it believed Mod 1 was in error and that the correct thickness is .0002" to .00025". Plaintiff attached a list of stock numbers that required the same type of plating and noted that all drawings indicate a thickness of .0002" to .00025". On June 14, 1991, the CO requested another review by DCSC–STD. The June 26, 1991, DCSC–STD response acknowledged that the plaintiff was correct, and provided a new line item description which changed the parenthesis to (.0002 to .00025 inch thickness).

In Modification PO0002, dated August 9, 1991, the CO corrected the item description by changing the parenthesis to (.0002 to .00025 inch thickness). Mod 2 incorporated by reference plaintiff's May 24, 1991, letter.

By letter dated August 22, 1991, plaintiff requested an extension of 90 days due to the correction of the procurement item description regarding plating thickness. Modification PO0003, dated August 30, 1991, extended the delivery schedule from August 4, 1991, to November 4, 1991. Plaintiff's August 22, 1991, letter was incorporated by reference.

Plaintiff did not deliver the supplies by the extended delivery date of November 4, 1991. On December 12, 1991, the CO called the QAR and told him the order was being cancelled. On December 12, 1991, plaintiff tendered the eight parts kits for inspection by the QAR. The QAR told plaintiff he could not inspect the items, as the order was cancelled. In Modification PO0004, dated December 13, 1991, the CO unilaterally modified the contract on the standard form in which the overprint includes: "Since the required delivery date was not met, the Government's offer to purchase has lapsed."

Plaintiff did not meet the delivery date in the unilateral offer, August 4, 1991, and the offer lapsed on that date. The CO revived the offer on August 9, 1991, in Mod 2, after verification of plaintiff's May 24, 1991, request for assistance. The offer as revived extended the delivery date for a reasonable amount of time. Mod 3, on August 30, 1991, established 90 days as the reasonable amount of time on the basis of plaintiff's August 22, 1991, letter. As revived, the offer had a delivery date of November 4, 1991. Plaintiff did not make delivery on or before that date.

Plaintiff's contention that a revived offer after lapse constituted an entirely new delivery schedule with as much time as the original order is without legal support in decisions of the ASBCA or from any other source. The argument has no merit. When a purchase order is revived, it is revived for a "reasonable time." *Klass Eng'g,* ASBCA No. 22,052, 78–2 BCA ¶ 13,236; *Ordnance Parts and Eng'g, Co.,* ASBCA No. 37,985, 89–2 BCA ¶ 21,805, 1989 WL 47587; *Sunshine Cordage Corp.,* ASBCA 38,904, 90–1 BCA ¶ 22,382.

Plaintiff had from August 30, 1991, to November 4, 1991, to ask the CO for additional time if the 90 days were unreasonable. Plaintiff made no such request.

Plaintiff contends that the CO refused to grant the day-for-day delivery schedule extension originally requested and then coerced it into agreeing to an inadequate 90–day extension. The CO denies that plaintiff requested a day-for-day extension, and further denies that she pressured or cajoled plaintiff into requesting an insufficient extension. On this issue the affidavit of plaintiff's contract manager and the declaration of the CO are in direct conflict. Credibility is a fact issue that should not be resolved on summary judgment. *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 470, 82 S.Ct. 486, 489–90, 7 L.Ed.2d 458 (1962); *Scripps Clinic and Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1578 (Fed.Cir.1991).

Plaintiff's motion for summary judgment must be denied. Defendant is not entitled to judgment on this unilateral procurement because of the confusion in the plating specification issue and because credibility of the active parties in this transaction is an issue.

*No. –1944*

Procurement No. –1944 was a bilateral negotiated firm fixed-price contract awarded on July 2, 1990, on the basis of plaintiff's response on March 28, 1990, to an RFP issued March 13, 1990. The RFP and the contract contained the following line item description for part NSN 4730–01–194–0286:

STRAINER, SEDIMENT. GUN METAL MATERIAL.

18.250 INCHES NOMINAL HEIGHT, 28.500 INCHES NOMINAL WIDTH, WITH BOLTED COVERS.

END ITEM–4 INCH DUPLEX STRAINER.

QUALITY ASSURANCE PROVISION 140A 1 MAR 83 APPLIES.

I/A/W DWG NR 96169 75651–41X2

BASIC DTD 61 APR 04
AMEND NR F DTD 64 SEP 02
TYPE NUMBER ASSEMBLY
ASSEMBLY DRAWING

The contract was on DCSC standard forms; it included by reference the Default,

Changes, Disputes and Termination for Convenience of the Government (Short Form) articles. The contract was for three sediment strainers, at a total price of $46,965, with delivery in 240 days (Feb. 27, 1991) from the date of award.

Plaintiff submitted two requests for deviation/waiver which the ACO prepared in writing on October 1, 1990, and the CO received on October 12, 1990. The requests related to parts of the line item (Studs PC 26, and Basket Bottom—PC.4 MK 4) and involved drawings and specifications related to use of cold rolled or hot finished material. The requests did not involve any porosity problems. The CO forwarded the requests by memorandum on January 24, 1991. The Directorate of Technical Operations recommended disapproval of the requests on February 25, 1991, and the Directorate of Quality Assurance recommended disapproval of the requests on April 12, 1991.

By letter dated January 31, 1991, plaintiff's operations manager advised the CO that plaintiff did not expect to meet the delivery requirements due to improperly cast materials and it anticipated shipping the contract in May 1991. The CO's January 28, 1992, termination recommendation included references to letters between the plaintiff and the CO dated February 28, April 25, April 26, May 2, May 24, June 6, and June 24, 1991, which are not in the record. This correspondence apparently related to delays in plaintiff's receipt of a response to the requests for deviation/waiver, plaintiff's assertion of a need for delivery extension of the same number of days it took defendant to respond, the CO's notice on April 26 that because of disapproval of the requests for deviation/waiver the contract would not be changed, and plaintiff's assertion that further material clarification was needed before a firm delivery schedule could be established. The record does not contain, also, the drawings and specifications that are the subject of the analysis of plaintiff's requests for deviation/waiver.

On July 19, 1991, plaintiff asked the CO to have the deviation/waiver requests re-reviewed, and advised the CO that if the re-evaluation was not made, plaintiff would seek cancellation costs and reimbursement of ad-

ministrative costs. The letter stated that if the waiver requests were granted by August 31, 1991, plaintiff would deliver by December 31, 1991, or, if otherwise, within 120 days of approval.

On September 11, 1991, DCSC's Assistant Fraud Counsel responded that due to delay in evaluating the waiver requests, defendant unilaterally would extend the contract delivery date 132 days from the date of the letter, to January 24, 1992. The September 11, 1991, letter required plaintiff inform defendant of its intent to perform, advised plaintiff that only items produced in accordance with specifications would be acceptable and that failure to state its intent to perform would be viewed as a failure to progress under the contract, which could subject it to termination under the Default article.

The CO issued Modification PO0001 unilaterally on September 13, 1991. The modification extended the delivery date to January 24, 1992, and stated it was due to the delay in the Government's response to the requests for deviation/waiver. On September 19, 1991, plaintiff's operations manager advised that it intended to perform and that the unilateral extension of the delivery date to January 24, 1992, was acceptable.

On January 24, 1992, the CO by telephone was told by the QAR resident at plaintiff's facility that the items needed to be assembled and tested and that it was doubtful that plaintiff would present the sediment strainers for final inspection. The QAR was instructed, if the items were not presented, to hold no further discussions or piece inspections after January 27, 1992.

On January 27, 1992, plaintiff's operations manager telephoned the CO and advised that plaintiff needed another 30–day extension to complete the contract. On January 27, 1992, plaintiff presented subassemblies and parts for inspection. The QAR refused to inspect the pieces. The CO, by Modification PO0002, terminated the contract for default on January 31, 1992.

On February 5, 1992, the CO received a letter dated January 25, 1992, from plaintiff's operations manager. This letter stated that plaintiff had encountered porosity problems

with the castings, that the castings had been replaced with good castings, that plaintiff was in the final stages of assembly and testing, that the QAR refused to inspect and sign off on the components, and that testing could not be completed. The letter requested a 45–day extension of the delivery date.

By letter dated March 20, 1992, plaintiff's counsel advised the CO that it was plaintiff's position that the January 31, 1992, termination was improper and that it should be rescinded. The letter suggested that the CO should mitigate damages by inspecting and purchasing all completed goods in plaintiff's possession. The letter asserted the items could have been completed and available for final inspection on January 29, 1992, if the QAR had inspected the parts on January 27, 1992. The letter also recited numerous reasons the contract specifications were defective or obsolete, and plaintiff's failure to deliver was the result of delays in the Government's actions on the requests for deviation/waiver. On March 24, 1992, the CO responded that the letter was erroneous on the facts relative to plaintiff's status as of January 27, 1992, to complete manufacturing of the sediment strainers and was wrong as to requirements of the drawings and specifications. The CO denied the request to reconsider and rescind the termination for default.

There is no dispute that the contract required delivery on January 24, 1992, and that plaintiff did not meet that date. The Default article for fixed-price supply contracts authorized the CO to terminate the contract when the contractor fails to deliver within the time specified or extended. FAR § 52.249–8(a)(1)(i).

The termination was not for failure to make progress (FAR § 52.249–8(a)(1)(ii)) or for failure to perform any other provision of the contract (FAR § 52.249–8(a)(1)(iii)) and a 10–day cure notice (FAR § 52.249–8(a)(2)) was not required. The CO took no action that could be construed as a waiver of the delivery date. FAR § 49.402–3(c).

 The Government's right to terminate a contract for failure to perform includes the right to insist upon the scheduled

delivery date. The cure notice provision typically solely applies to performance failures other than the failure to make delivery. *See Universal Fiberglass Corp. v. United States,* 210 Ct.Cl. 206, 537 F.2d 393, 398 (1976). In deciding whether to terminate a contract for default, the CO is required to exercise discretion to ensure that termination is in the best interest of the Government. *Nuclear Research Corp. v. United States,* 814 F.2d 647 (Fed.Cir.1987). When plaintiff materially breached the contract by its failure to deliver, the CO's determination to terminate the contract for default because the Government no longer required the goods was logical.

Plaintiff contends the contract drawings and specifications were defective because of the "gun metal" requirement, which caused delays to rework or replace the castings. The Government, according to plaintiff, was responsible for the failure to deliver because defective specifications allegedly made timely production impossible or commercially impracticable. As a result, plaintiff claims that it either was not in default, or the default was excusable, and that the default should be reversed and converted to a Termination for Convenience of the Government under FAR § 52.249–8(g). Plaintiff supports its allegation of defective specifications by an expert's report, dated April 29, 1993, by a metals and materials consultant. Even if it were assumed that the report was prepared by a person who could be qualified as an expert, and who was familiar with the production of sediment strainers, the report is in direct contradiction to the recommendations of the DCSC quality assurance directorate. When there are expert opinions in conflict, particularly when the record is deficient as to applicable drawings and specifications, summary judgment is not appropriate.

Further, plaintiff bid on this project and executed a bilateral contract, after notice that "gun metal" was required. Plaintiff is bound as a party to what it has knowingly promised to do. RESTATEMENT (SECOND) OF CONTRACTS § 21 (1981). The defense of impossibility is not available where the events were foreseeable by the parties. *Ocean Air Tradeways, Inc. v. Arkay Realty Corp.,* 480 F.2d 1112 (9th Cir.1973). Plaintiff knowingly bid and contracted on a "gun metal" supply contract.

Plaintiff complains that it had to purchase eight very expensive castings to obtain three good castings. Regardless of the technical soundness of the Government's requirements, a contractor must comply with them and cannot substitute its own views for those of the Government. *Maxwell Dynamometer Co. v. United States,* 181 Ct.Cl. 607, 386 F.2d 855, 868 (1967); *see also Austin Co. v. United States,* 161 Ct.Cl. 76, 314 F.2d 518, 520 *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963) (noting that plaintiff "was not under any compulsion to enter into the contract" and was therefore bound to perform in accordance with the specifications); *Jet Constr. Co. v. United States,* 209 Ct.Cl. 200, 531 F.2d 538, 543 (1976). Having accepted this fixed-price contract, the additional costs of production are the responsibility of the plaintiff.

Whether performance is actually "impossible," or merely more difficult, is a factor to be considered. Legal impossibility, in addition to literal impossibility, includes "commercial impracticability," which exists where performance can be undertaken only at an excessive and unreasonable cost. *International Elecs. Corp. v. United States,* 227 Ct. Cl. 208, 646 F.2d 496, 510 (1981) (contractor due to an ongoing strike was unable to perform with a specified number of technicians). Plaintiff ultimately was able to complete performance in accordance with the specifications. While plaintiff claims that the Government's specifications made performance more expensive than originally anticipated, performance was not impossible, nor was the added expense "excessive and unreasonable." *See Astro–Space Labs., Inc. v. United States,* 200 Ct.Cl. 282, 470 F.2d 1003, 1013 (1972). While the question of whether a contract is factually possible or commercially practical to perform is a question of fact, there is no dispute here that plaintiff did ultimately complete performance using the specifications provided by the Navy.

Having performed the work in accordance with the specifications, plaintiff has an extraordinarily heavy burden to establish that

the specifications are defective. In *Astro-Space,* the Court of Claims found evidence that other contractors had performed according to the same contract specifications to be decisive, and held that "performance of an exact same contract during reprocurement is persuasive that the contract was not impossible to perform." *Accord, Astronautics Corp. of America v. United States,* 193 Ct.Cl. 910, 436 F.2d 430, 437 (1971). The Court of Claims in connection with invocation of commercial impracticability has observed: "[t]he commercial impracticability standard can be easily abused; thus this court has not applied it with frequency or enthusiasm. It is not invoked merely because costs have become more expensive than originally contemplated." *Jennie-O Foods, Inc. v. United States,* 217 Ct.Cl. 314, 580 F.2d 400, 409 (1978) (citations omitted).

Plaintiff's motion for summary judgment must be denied. On plaintiff's version of the facts, the CO's termination of No. –1944 for default was appropriate. Defendant, however, is not entitled to summary judgment on Count IV or to judgment because the record is incomplete and material issues of fact are in dispute.

*No. –2046*

Procurement No. –2046 was a bilateral negotiated firm fixed-price contract awarded April 22, 1991, on the basis of plaintiff's response on March 14, 1991, to an RFP that was issued on February 25, 1991. The RFP and the contract contained the following line item description for part NSN 4820–01–232–2435:

SEAT, VALVE. MATERIAL STEEL. IAW CITED DRAWING WITH THE FOLLOWING EXCEPTIONS: IN NOTE 2 OF GENERAL NOTES, MIL–STD–1688 MAY BE USED IN LIEU OF (0900–006–9010) FOR FABRICATION WELDING AND INSPECTION; NOTE 3 DOES NOT APPLY TO THE FABRICATION OF THIS SEAT.

I/A/W DWG NR 80064 4497220

BASIC DTD 72 FEB 17
AMEND NR L DTD 82 JUL 26
TYPE NUMBER ITEM 3
DETAIL DRAWING

The contract was on DCSC standard forms; it included by reference the Changes, Default, Disputes and Termination for Convenience of the Government (Short Form) articles. The contract was for four valve seats at a total price of $55,160 with delivery 360 days (April 16, 1992) from the date of award.

PO0001 was a bilateral amendment executed by plaintiff's operations manager and the CO on April 6, 1992, to correct a mistake in the Preparation for Delivery section of the schedule. It recites that the adjustment constitutes a complete accord and satisfaction for all claims including delays to the date of the modification. Communications between the CO and the operations manager relative to Mod 1 are in dispute.

PO0002 was a unilateral modification of the line item description issued April 15, 1992, that added two sentences relative to the orientation of a drilled and tapped hole and the requirements of applicable drawings. Mod 2 incorporated a letter dated April 6, 1992, which the CO received by fax on April 8, 1992. Communications between the CO and plaintiff's operations manager on April 8, 1992, and between the CO and the QAR on April 15, 1992, relative to status of completion of the work, including the time required to drill the holes and complete the items, are in dispute.

PO0003, issued April 21, 1992, was a unilateral termination of the contract for failure to make delivery on or before April 16, 1992. The failure to meet the contract delivery date was found to be nonexcusable and the contract was terminated for default under the provisions of FAR § 52.249–8. Mod 3 was a final decision of the CO pursuant to the CDA. 41 U.S.C. § 605(a).

There is no dispute that the contract required delivery on or before April 16, 1992, and that plaintiff did not meet that date. Plaintiff on April 22, 1992, requested the CO either to reinstate the contract or to allow a 100 percent cancellation charge. The letter contended DCSC's delays and the CO's knowledge that the supplies were 99 percent complete showed that the contract was terminated for convenience. On May 7, 1992, the CO addressed the concerns plaintiff raised,

and contradicted allegations as to the extent of plaintiff's completion of the work. The CO denied the request to reconsider the termination for default.

The CO's April 17, 1992, termination recommendation includes references to correspondence and communications dated November 6, December 3, and December 11, 1991, that relate to plaintiff's requests for approval of welding procedures on this contract and its relationship to another contract with plaintiff for delivery of the same line item. These letters and communications are not in the record.

The attachments to the CO's January 28, 1992, letter, regarding plaintiff's welding procedures, are not in the record. Those communications are material to plaintiff's claims that defendant is responsible for delays and alleged inability to meet the delivery schedule. The communications of the parties when Mod 1 was executed with the amendments to packaging for delivery are material to the scope and purpose of the parties' accord and satisfaction that is recited in Mod 1.

The communications of the parties during the telephone conversations on April 8 and April 15, 1992, as recorded by defendant, attribute contentions and positions purportedly made by plaintiff that plaintiff now denies. Materials now in the record are not sufficient to resolve these differences. These contentions involve material facts that cannot be resolved at this time through summary judgment procedures.

Accordingly, plaintiff's motion for summary judgment on No. –2046 must be denied, and defendant's motion for summary judgment must be denied.

*No. –U620*

On May 13, 1991, DCSC issued an RFQ (DLA 760–91–Q–D021) for six 1½ inch ball valves (NSN 4820–01–138–2278). The RFQ on continuation sheet No. 3, in Item 16, states: "There are no drawings available for this requirement." Plaintiff's response to the RFQ included a letter dated January 31, 1992, that advised DCSC that "our offer conforms to all current drawings." Unilateral order No. –U620, when issued on February 11, 1992, included as Page 1(a), plaintiff's January 31, 1992, letter. The line item description in the unilateral order referred to four drawings dated April 18, 1962, through August 5, 1955, with amendments dated April 19, 1963, through October 28, 1956. The line item description states:

VALVE, BALL 1½ INCH

THE REQUIREMENTS OF SPECIFICATION MIL–L–61002 AS REQUIRED IN MIL–STD–129L ARE WAIVED. THE REQUIREMENTS OF MIL–STD–129K, APPENDIX H, PARAGRAPHS 20.4 THROUGH 20.8 ARE INVOKED. ALL OTHER REQUIREMENTS OF MIL–STD–129L SHALL CONTINUE IN FORCE.

"POTENTIALLY HAZARDOUS, SEE CERTIFICATION".

I/A/W DWG NR. 80064 1889755
BASIC DTD 62 APR 18
AMEND NR B 63 APR 19
TYPE NUMBER ASSEMBLY G
DETAIL DRAWING
I/A/W DWG NR 80064 1889756
BASIC DTD 62 APR 18
AMEND NR B 66 NOV 12
TYPE NUMBER
DETAIL DRAWING
I/A/W DWG NR 80064 1889757
BASIC DTD 62 APR 18
AMEND NR B 66 JAN 17
TYPE NUMBER
DETAIL DRAWING
I/A/W DWG NR 80064 841337
BASIC DTD 55 AUG 05
AMEND NR G 56 OCT 28
TYPE NUMBER
DETAIL DRAWING

The unilateral order called for delivery by January 6, 1993, of six ball valves for a total price of $17,700. The special clauses from the January 1992 DCSC Master Solicitation, Part III, that were incorporated by reference included New Material (Apr. 1984) FAR § 52.210–5.

ADF001, effective March 20, 1992, was a unilateral modification pursuant to FAR § 43.103(b) which administratively changed the location of the payment office.

On August 27, 1992, the CO responded to a letter from plaintiff's operations manager dated August 20, 1992. Plaintiff's August 20, 1992, letter is not in the record. The subject

matter of this correspondence, however, appears to involve a request from plaintiff concerning inspections by the Government and certifications by plaintiff's suppliers. There is reference to a modification PO0001, which is stated to remain in full force and effect. The record does not contain a modification PO0001, nor does it contain DD 250's apparently submitted by plaintiff and returned without processing by defendant.

The declaration of the CO, dated September 27, 1993, avers that the August 27, 1992, letter was written and sent because the Government was informed that plaintiff might be supplying a nonconforming component part. The declaration states that an agent from the Defense Criminal Investigation Service also seized items from the package so that the Government could test for material compliance. The CO determined that the material was unacceptable when plaintiff could not provide adequate documentation to substantiate the conformity of the material.

The CO's August 27, 1992, letter concludes with a rejection of the certification by plaintiff's supplier for the union gaskets and a request that the test reports be provided for examination by the CO. The test reports were to be faxed to the CO by September 4, 1992. The letter warns that failure to provide these records to substantiate material acceptability may result in rejection without Government testing.

On September 17, 1992, the CO responded to a letter from plaintiff's operations manager dated September 9, 1992. Plaintiff's September 9, 1992, letter is not in the record. Defendant's September 17, 1992, letter recapitulates the August 27, 1992, letter. The CO refers to a certification that had been made by a new supplier to plaintiff. The certification was found to be unacceptable because the "test reports" are not on file for examination. The September 17, 1992, letter advised that the supplies were rejected for failure to substantiate material acceptability of the union gaskets. Testing was not performed by the Government, the units were not disassembled, and were returned in the same condition as when tendered for delivery. The record is not clear as to the precise date the six items were tendered for testing.

PO0002, effective September 17, 1992, was executed on September 17, 1992, as a unilateral modification of order No. –U620. The authority for this action, designated by a check mark on Item 13 of the DCSC standard form, is stated: "Unilateral Per Restatement (Second) of the Law of Contracts, Section 58."

Plaintiff contends order No. –U620 incorporates by reference the Changes, Government Delay of Work, Default and Termination for Convenience of the Government articles in their usual form. Plaintiff's analysis of order No. –U620 is erroneous. The special clauses in A1A—A1D in Part III of the DCSC Master Solicitation—Small Purchase, January 1992, does not incorporate those articles by reference. Plaintiff's arguments based on inclusion of these provisions is without merit.

Plaintiff also views the acceptance by completion of substantial performance under FAR § 13.108(b) of the unilateral order, in effect, produces a bilateral contractual relationship that is identical to the relationship that exists after a CO requests a written acceptance of the offer and a contractor accepts. This view also is without merit. Acceptance of the offer by completion of substantial performance does not preclude cancellation of the order for noncompliance with material acceptability requirements prior to the delivery date.

Plaintiff argues that it should have been allowed a cure time under the Inspection article (A1A(25)(h)), which was incorporated by reference into the order. Subsection (h) permits the Government when a contractor fails to correct rejected supplies to either (1) remove, replace, or correct rejected supplies and charge the cost to the contractor, or (2) terminate the contract for default. This provision gives the CO the discretion to either require a cure or to terminate for default. Plaintiff was given a chance to cure the defect. Plaintiff continued to insist on using union gaskets which were uncertified and "unacceptable."

Plaintiff argues in the alternative that case law allows it the time to cure. Plaintiff cites *Radiation Technology, Inc. v. United States,*

177 Ct.Cl. 227, 366 F.2d 1003, 1006 (1966). *Radiation Technology* is not apposite. It involved a cure clause incorporated in a bilateral contract that allowed for cure. The Inspection article in No. –U620 allows for cure at the CO's discretion. The CO gave plaintiff a chance to cure, and plaintiff did not.

For the foregoing reasons, plaintiff's motion for summary judgment on procurement No. –U620 must be denied. Defendant is not entitled to judgment because the record is incomplete, and material issues of fact are in dispute.

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment on each of these procurements is denied. Defendant's motion to dismiss the unilateral procurements under RCFC 12(b)(4) is denied. Defendant's motion for summary judgment as to all procurements is denied. Neither party is entitled to judgment at this time on any part of this case. Procedures that are to apply in further proceedings will be established and scheduled by subsequent order.